STATE OF NORTH CAROLINA v. JASPER DAVID LOONEY

No. 47

(Filed 24 January 1978)

1. **Conspiracy § 4; Criminal Law § 10— indictment for conspiracy—accessory before the fact not lesser offense**

   One indicted for conspiracy to murder may not, upon that indictment, be convicted as an accessory before the fact since the actual commission of the contemplated murder is an essential element of the offense of being an accessory before the fact to the murder but is not an essential element of the offense of conspiracy to murder.

2. **Conspiracy § 4; Criminal Law § 10— indictment for accessory before the fact—conspiracy not lesser offense**

   One may not be convicted of conspiracy to commit murder upon an indictment for being an accessory before the fact to such murder since the reaching of an agreement is an essential element of the offense of conspiracy but is not an essential element of being an accessory before the fact.

3. **Conspiracy § 3; Criminal Law § 10— conviction of both conspiracy and accessory before the fact**

   The offense of conspiracy and the offense of being an accessory before the fact are separate, distinct crimes which do not merge into each other and neither of which is a lesser included offense of the other. A person may, therefore, be lawfully convicted of and punished for both a conspiracy to commit a murder and being an accessory before the fact to the same murder.

1

**4. Criminal Law § 117.4— plea bargain by State's witness—credibility—erroneous instruction—error cured by further instruction**

The trial court's inadvertent error in instructing the jury that testimony by a prosecution witness that he had been allowed to plead guilty to a reduced charge of second degree murder in exchange for his testimony in defendant's case was immaterial to the jury's determination of the facts in defendant's case was cured when the court thereafter instructed that such testimony was material upon the question of the witness's credibility but not otherwise.

**5. Criminal Law § 65— testimony that man's eyes "lit up"—non-expert opinion**

In this prosecution for conspiracy to murder and accessory before the fact to murder, a witness was properly allowed to testify that when a man whose appearance was similar to defendant's met the perpetrator of the murder on a city street, the man's eyes "lit up," that is, "showed like he knew the man," since the testimony constituted a shorthand description of the reaction of the other person to meeting the perpetrator, and the emotion displayed by such person on the given occasion was a proper subject for opinion testimony by a non-expert witness.

**6. Criminal Law § 101.4— sequestration of jury—discretion of court**

Whether the jury should be sequestered during deliberations was a matter within the discretion of the trial judge.

**7. Criminal Law § 113.1— recapitulation of evidence—absence of objection**

Defendant's contention that the trial court erred in failing sufficiently to review the evidence solicited on cross-examination of two State's witnesses is without merit since the law does not require the recapitulation of all of the evidence in the charge, and since no alleged omission in the court's recapitulation of the evidence was brought to the attention of the court prior to the jury's retirement to consider its verdict.

**8. Criminal Law § 89.7; Witnesses § 1— absence of authority to order psychiatric examination of witness**

A trial judge in North Carolina does not have the authority to order a psychiatric examination of a proposed witness on the question of credibility as a condition to receiving the testimony of that witness.

**9. Criminal Law § 89.7; Witnesses § 1— refusal to order psychiatric examination of State's witness—no abuse of discretion**

Even if it were held that judges of trial courts in North Carolina have inherent power, in their discretion, to order an unwilling witness to submit to a psychiatric examination, the trial court in a prosecution for conspiracy to murder and accessory before the fact to murder did not abuse that discretion in the denial of defendant's pretrial motion for an order requiring the State's chief witness—the actual perpetrator of the murder—to submit to an examination by a psychiatrist selected and compensated by defendant to determine whether the witness is a "psychopathic liar" where: a psychiatric examination of the witness had already been made in the witness's own case by the staff of Dorothea Dix Hospital to determine his capacity to stand trial and his mental responsibility for crime, and the staff report and the testimony of the examin-

ing psychiatrist were available to defendant; without a further psychiatric examination, the defendant was in a position to show that the witness had committed the murder with exceptional brutality, which defendant contended was an indication of his mental abnormality; defendant was further in the position to show that the witness originally gave the police a statement completely at variance with his present testimony and recanted that statement in exchange for permission to plead guilty to second degree murder; and there was, therefore, no showing of any compelling necessity for a further psychiatric examination of the witness in order to enable defendant to present to the jury his contention that the witness's testimony was not worthy of their belief.

Justice EXUM concurring.

APPEAL by defendant from *Herring, J.*, at the 14 February 1977 Session of CUMBERLAND.

Upon separate indictments, each proper in form, the defendant was convicted of conspiracy to commit murder and of being an accessory before the fact to the murder of his wife, Gloria Jean Looney, a third charge of murder of Gloria Jean Looney having been dismissed by the court at the close of all of the evidence. Upon the charge of conspiracy to commit murder, the defendant was sentenced to imprisonment for 10 years. Upon the charge of being an accessory before the fact to murder, he was sentenced to imprisonment for the term of his natural life, this sentence to commence at the expiration of the sentence imposed for conspiracy to commit murder.

From the judgment so imposed the defendant appealed, his appeal from the judgment sentencing him to imprisonment for life on the charge of being an accessory before the fact of murder being, as a matter of right, an appeal to the Supreme Court and his appeal from the judgment sentencing him to imprisonment for 10 years on the charge of conspiracy to commit murder being to the Court of Appeals. The Supreme Court allowed the defendant's motion to hear the latter appeal prior to its determination by the Court of Appeals and the two were heard together in the Supreme Court.

Uncontroverted evidence for the State is ample to show that Gloria Jean Looney was murdered in her home in Fayetteville on 30 December 1974 by Richard Stanley Matthews, that Matthews, when charged with this murder, was permitted to enter a plea of guilty to murder in the second degree and that, upon such plea,

he was sentenced to imprisonment for life, which sentence he was serving at the time of the trial of the defendant Looney. The uncontroverted evidence further shows that such murder was perpetrated with extreme brutality, the victim having been struck upon the head numerous times with a hammer, so that her skull was fractured in several places, and having been stabbed in the throat and in numerous other areas of her body with a knife and with a pair of scissors, there being a number of such injuries which, independently, would have been sufficient to cause her death. The questions at issue in the trial of the present defendant related to what connection, if any, he had with the murder.

When arrested shortly after the murder of Gloria Jean Looney, Matthews gave to the investigating officers a written statement admitting that he killed her, using the hammer, knife and scissors. In this statement the present defendant was not mentioned, Matthews saying that he, looking for a job, went to the Looney home, rang the door bell and was admitted into the house by the deceased in response to his request to use the telephone, the deceased having come to the door clad only in a thin negligee. According to this statement, as they conversed, Matthews made sexual advances to the deceased which she repulsed. This angered him and he proceeded to kill her.

Matthews was then committed to Dorthea Dix Hospital, presumably upon the motion and request of his counsel, for an examination to determine his competency to stand trial and his ability to distinguish right from wrong and to know the nature and consequences of his actions at the time of the alleged crime. He was returned to the court by the hospital as competent to stand trial, the report of the hospital showing:

"His memory appeared to be intact for recent and remote events. * * * In brief, there was not evidence of any psychosis at the time of the initial examination. * * * [He] is, at the present time, capable of cooperating with counsel. He is aware of the nature of the charges against him and the possible consequences of conviction. * * * Psychiatric examination of the defendant [Matthews] does not reveal the presence of a psychiatric disorder which would render the patient unable to know right from wrong or unable to know the nature and consequences of his actions. The patient denies

the alleged crime. He also denies mental or emotional difficulty but claims he was in a situational stress because of lack of employment.

"PSYCHIATRIC DIAGNOSIS: Without Psychosis,

"Not Insane."

Several months thereafter, the indictments against the present defendant (Looney) were returned as true bills by the grand jury, Matthews, meanwhile, before entering a plea in his own case, having informed the investigating officers that the defendant (Looney) hired Matthews to kill the defendant's wife. The defendant, thereupon, moved in the Superior Court for an order directing that Matthews submit himself, under proper supervision, to a psychiatric examination by a psychiatrist not under the direct control of the State and that a copy of the report of such psychiatrist be furnished to the defendant, the defendant asserting that the acts of Matthews were those of an independent, psychopathic killer and that Matthews is a pathological liar, subject to extreme fantasies and unable to distinguish fantasy from reality. This motion was heard and denied by Judge McKinnon.

Subsequently, the defendant again moved in the Superior Court that Matthews "be required to undergo a psychiatric examination by a psychiatrist chosen by the defendant and at the defendant's expense," asserting that, since Judge McKinnon's ruling on the earlier motion, the results of the psychiatric examination of Matthews at Dorthea Dix Hospital, above mentioned, had become available to the defendant, and that the matters shown in such report, together with the fact that Matthews had been allowed to enter the plea of guilty to second degree murder in his own case in exchange for his testimony against the present defendant (Looney), required that Matthews undergo a complete and independent psychiatric examination prior to the trial of the defendant. This motion was heard and denied by Judge Clark. Its denial is assigned by the defendant as error upon the present appeal.

Upon the trial of the present defendant, Matthews testified as a witness for the State. In addition to the circumstances of the killing of the defendant's wife, Matthews testified to the following effect:

He first became acquainted with the defendant in 1973, seeing him socially on several occasions. He asked the defendant, an automobile salesman, to help him get a job. Matthews then left Cumberland County and went to New York City, returning in December 1974. A week later, the defendant picked him up in his car and, when Matthews told him he still needed a job, replied that he would keep Matthews in mind. A few days later, the defendant drove his car to Matthews' house, picked him up and, as they drove about, told Matthews he had a job for him. They then agreed that for $3,000 Matthews would kill the "woman who was living with" the defendant, the defendant saying that he wanted "the job to look like a maniac had done it." It was then agreed that Matthews would gain access to the house by telling "the woman" the defendant had sent him to make a preliminary examination preparatory to the building of a fireplace. The defendant also directed Matthews as to how he should leave the house after accomplishing the killing. It was first agreed that the killing was to be done the next morning, but when Matthews went to the Looney home, no one answered the door and he left, so reporting to the defendant. It was then agreed that the defendant would get back in touch with Matthews for another effort. On the morning of 30 December 1974, while Matthews was temporarily away from home, the defendant telephoned Matthews' home and left a message with Matthews' wife. As a result, Matthews went to the Looney home, accomplishing the killing in accordance with the plan and so reported to the defendant by a telephone call to his place of employment.

Other evidence offered by the State tended to show:

At the time of the death of Gloria Jean Looney, there were in effect life insurance policies upon her life, naming the defendant as beneficiary, or co-beneficiary, in the amounts of $5,000, $1,000 and $12,000. There was also in effect a mortgage term life insurance policy for $50,000 which was taken out approximately four months prior to the murder, and of which he was a beneficiary.

In the Spring of 1974, the defendant became acquainted with a 16 year old girl named Carolyn Brown and asked her "to be his woman." Ultimately, she agreed and they began having sexual relations periodically about the middle of December 1974. After the death of the defendant's wife, he told Carolyn Brown he

State v. Looney

"would be getting around $50,000." Carolyn Brown, who testified
to these things, originally gave investigating officers a statement
to the above effect, but subsequently wrote a letter to the
District Attorney and to the defendant's attorney repudiating this
statement.

Matthews' wife and their neighbor, witnesses for the State,
testified to having seen the defendant and Matthews talking to
each other in the defendant's conspicuous automobile, parked in
front of the Matthews' home. Matthews' wife further testified
that early in the morning, "one or two days before New Year's,"
the defendant came to her home while Matthews was absent and
told her that he had a job for him and Matthews was to go to his
office "on Murchison Road" and to be there by 11 o'clock. Mur-
chison Road is near the defendant's home, apparently not near his
place of employment. Shortly after this, Matthews returned home
and was given the message. Matthews left a few minutes later
and did not return until late afternoon. After his arrest, Mat-
thews' wife found among his papers a scrap of paper bearing the
defendant's telephone number and the name of "David Lonnie,"
which paper she delivered to the police. It was introduced in
evidence. Matthews' wife called this number, asked to speak to
"Mr. David Lonnie." After a short delay a man's voice, which she
recognized as that of the man who had so come to her home and
left the message for her husband, came on the phone but seemed
to know nothing about Matthews, so the conversation terminated.
A few minutes later, the same person called Matthews' wife, say-
ing he could not talk to her on the first call for fear that it might
be "intercepted," and that he was then calling from a pay
telephone. He told her to go to another pay telephone and call the
number of the phone from which he was speaking, and also told
her that if anyone asked her anything, "You don't know nothing."
Matthews' wife did not return that telephone call. Subsequently,
while riding with police officers, looking for it, she pointed out
the car occupied by the man whom she had seen in conversation
with Matthews in front of their home. This was the automobile of
the defendant.

The General Manager of the automobile dealer for whom the
defendant then worked testified that he saw the defendant about
9:30 a.m. the morning of the murder and he "appeared real ner-
vous." This witness also testified that approximately 30 to 60

days before the murder he spoke to the defendant concerning the defendant's "going with" a girl, who was neither the defendant's wife nor Carolyn Brown, telling the defendant he could do as he wished on his own time so long as it did not reflect on the employer. The defendant "got upset" about this.

Another witness for the State, who in 1973 was a fellow-employee of the defendant, testified that the defendant asked the witness if he knew how to get in contact with a "hit man," which the witness told him he did not know how to do. This witness also testified that, "concerning his relationship with his wife, David Looney told me he was unhappy."

Still another witness for the State testified that he knew Matthews and the defendant in December 1974 and, on one occasion, prior to the murder, while the witness was in conversation with Matthews on a street corner, the defendant drove up, Matthews got in the defendant's car and the two drove off together after the defendant spoke to the witness.

The defendant, on the other hand, offered evidence of a number of character witnesses who testified to his good character and to his being an exceptionally successful and happily married automobile salesman.

Another witness for the defendant testified that, while he was in jail with the defendant and Matthews, the witness being a trusty, Matthews sent the witness to the defendant with a message that he (Matthews) "would change his story and tell the truth" if the defendant would give him "two bills." The defendant sent back a message that he did not have any money.

The defendant, testifying as a witness in his own behalf, flatly contradicted the testimony of Matthews, the testimony of Carolyn Brown as to his relationship with her, and the testimony of the other witnesses for the State who claimed to have seen him in the company of Matthews. He testified that he, himself, took out the $50,000 mortgage life insurance policy, it covering his life as well as that of his wife, he and the daughter being the beneficiaries in the event of the wife's death and the wife and daughter being the beneficiaries in the event of his death. The Looney home was mortgaged to the extent of $28,000. He testified that he did not know of the $5,000 policy, a group policy applicable to the employees of the company for which his wife

State v. Looney

worked, that he gave his wife a Cadillac automobile and a color television set for Christmas just before her death, that they were happily married, that he had never said anything to his wife about building a fireplace in their home, that he never saw Matthews the day his wife was killed, that he did not talk to Matthews' wife that day and had never seen either of them at that time to his knowledge, saying, "I don't think I have ever spoken to Richard Stanley Matthews in my life," and that he had never had Matthews ride in his automobile.

Another witness for the defendant testified that he did not notice any nervousness or anything else unusual about the defendant the morning of the murder before he received the telephone call telling of his wife's death, but, when he received the call, he was in a state of shock and was "torn all to pieces." This witness had visited in the Looney home and believed the defendant and his wife were very happy.

Dr. William N. Taylor, a witness for the defendant, was a staff psychiatrist for Dorthea Dix Hospital at the time Matthews was committed and examined there. He participated in the examination of Matthews. It was then his opinion that Matthews was competent to stand trial. He testified that Matthews denied killing Gloria Jean Looney, that he scored in the normal range of intelligence, that he showed no evidence of brain damage, and that he did not appear to be a maniac, but the results of the tests "indicated the possibility of a psychopathic personality." Dr. Taylor further testified: "There were indications that he probably had difficulty postponing gratification, which is characteristic of a psychopathic personality. A psychopath is a person who is lacking in conscience and unable to feel guilt 'or pain for suffering they might inflict on others. They are antisocial in behavior. As a result of my psychological testing and interviews with Richard Stanley Matthews, I found evidence indicating that he had personality characteristics of a psycopath. * * * The characteristics of a psychopathic personality reveal one that is notoriously disloyal, unable to form trusting relationships, dishonest, feels no guilt over pain and suffering they inflict on others, unable to postpone gratification and will do anything they can to get their way." In the opinion of Dr. Taylor, conduct such as that in which Matthews engaged in killing Gloria Jean Looney "is highly suggestive but not necessarily diagnostic of a psycopath," it being also possible to consider it "consistent with schizophrenia." He

did not find any evidence of psychotic disorder in Richard Stanley Matthews, but his conduct in killing Gloria Jean Looney "would suggest psychopathic personality disorders." Dr. Taylor testified that he does not have any opinion as to whether or not Matthews was capable of committing a "contract killing."

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the State.*

*William L. Senter and Joe McLeod for Defendant.*

LAKE, Justice.

The defendant contends that the offense of conspiracy to commit a murder is a lesser included offense of being accessory before the fact to such murder and, consequently, the court erred in failing to require the State to elect the charge upon which it would proceed and in imposing sentences for both offenses. In this contention we find no merit. G.S. 14-5 provides:

> "*Accessories before the fact; trial and punishment.*— If any person shall counsel, procure or command any other person to commit any felony, *** the person so counseling, procuring or commanding shall be guilty of a felony, and may be indicted and convicted, either as an accessory before the fact to the principal felony, together with the principal felony, or he may be indicted and convicted of a substantive felony, whether the principal felon shall or shall not have been previously convicted, or shall or shall not be amenable to justice, and may be punished in the same manner as any accessory before the fact to the same felony, if convicted as an accessory, may be punished. *** Provided, that no person who shall once be duly tried for any such offense, whether as an accessory before the fact or as for a substantive felony, shall be liable to be again indicted or tried for the same offense."

In *State v. Bass*, 255 N.C. 42, 120 S.E. 2d 580 (1961), quoting with approval from C.J.S., Criminal Law, § 90, this Court said:

> "There are several elements that must concur in order to justify the conviction of one as an accessory before the fact: (1) That he advised and agreed, or urged the parties or in some way aided them to commit the offense. (2) That he was not present when the offense was committed. (3) That the principal committed the crime."

In *State v. Gallimore*, 272 N.C. 528, 158 S.E. 2d 505 (1968), speaking through Justice Higgins, we said:

> " 'A conspiracy is the unlawful concurrence of two or more persons in a wicked scheme — the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way by unlawful means. [Citing many cases.].' *State v. Goldberg*, 261 N.C. 181, 134 S.E. 2d 334 * * *. The crime is complete when the agreement is made. * * * Many jurisdictions follow the rule that one overt act must be committed before the conspiracy becomes criminal. Our rule does not require an overt act."

[1] Thus, the actual commission of the contemplated felony, in this case murder, by the principal (Matthews) is an essential element of the offense of being an accessory before the fact to the murder. This is not an essential element of the offense of conspiracy. Consequently, one indicted for conspiracy to murder may not, upon that indictment, be convicted as an accessory before the fact.

[2] Conversely, the reaching of an agreement is an essential element of the offense of conspiracy. It is not an essential element of the offense of being an accessory before the fact for one may counsel, command or encourage another to commit a crime which such other person then commits, without ever reaching an agreement with the first party that it shall be done. Thus, upon an indictment for being an accessory before the fact to a murder, one may not be convicted of conspiring to commit such murder.

[3] It follows that the offense of conspiracy and the offense of being an accessory before the fact are separate, distinct crimes, which do not merge into each other and neither of which is a lesser included offense of the other. A person may, therefore, be lawfully convicted of and punished for both a conspiracy to commit a murder and being an accessory before the fact to the same murder. We so held in *State v. Branch*, 288 N.C. 514, 551, 220 S.E. 2d 495 (1975), *cert. den.*, --- U.S. ---, --- S.Ct. where, speaking through Justice Copeland, we said:

> "Accessory before the fact to murder is a lesser included offense of murder and has similarly never been interpreted as negating the separate offense of conspiracy. *** It was not intended to relieve the party to murder who was an ac-

cessory before the fact from the penalty provided for conspiring with others."

This assignment of error is, therefore, overruled.

[4]   Matthews testified, after recounting the details of his killing of the defendant's wife:

> "I recall being arrested at the Trailway Bus Station in the cafeteria. The police officers took me to the law enforcement center and I gave them a statement. I later entered a plea of guilty to second degree murder. I was sentenced to life imprisonment and I am now confined at Central Prison. I am in my second year of imprisonment.

> *   *   *

> "After I gave that statement I was charged with first degree murder and was facing the possibility of the death penalty.

> *   *   *

> "As a result of my testimony in this case the charges against me were reduced to second degree murder. I was allowed to plead guilty to a lesser offense than first degree murder. I was sentenced to life imprisonment. I have not been promised anything about being considered for parole if I testified in this case."

After the jury had been deliberating for a time, it returned to the courtroom and requested of the court "a reclarification of why the charge [against Matthews] was reduced from first degree murder." The court replied:

> "Why the charge was reduced from first degree murder to second degree murder. The only way I can answer that is, I believe, that it's really not material to your determination of the facts in this case. There was, as I recall, some evidence that had some bearing on that question. There again, I cannot go into that and summarize what I recall the evidence was. Again, it is your duty to make that determination."

The jury then retired and resumed its deliberations. Thereafter, it again returned to the courtroom for a recess and before it again resumed deliberations the court instructed the jury:

"I have something I want to say about the question that was earlier put. The question put by the foreman of the jury earlier, as I recall it, dealt with why the witness Richard Stanley Matthews was allowed to plead guilty to second degree murder, and as I recall my answer at that time, I advised you that it was immaterial and that it was your duty to recall the evidence and to consider the evidence. I now correct that statement by instructing you that it is immaterial in this case that Richard Stanley Matthews pleaded guilty to second degree murder except that it is a factor that you may consider in determining whether to believe his testimony or not, and if you do believe it, in determining what weight you will give his testimony. And you may consider any evidence presented in the trial of this case as to how, when, or why he did plead guilty to second degree murder while he was charged with first degree murder if you find from the evidence presented that such was the case. Again, I instruct you that it is your duty to recall all of the evidence presented as it came from the various witnesses, and I cannot now recapitulate a part of what the evidence tended to show or allow a part of the record by the court reporter to be read back to you, and there are reasons for that which I will not go into in the instructions."

The defendant contends that these instructions by the court constituted an expression of opinion to the effect that the reason for Matthews' pleading guilty to second degree murder was immaterial. We find no merit in this assignment of error. This circumstance was, of course, as the court last instructed the jury, material upon the question of Matthews' credibility but not otherwise. The latter instruction of the court upon this point corrected the earlier inadvertent error and was a correct statement of law. Strong, North Carolina Index 3d, Criminal Law, § 168.1.

[5] The State's witness Bradford testified that on one occasion while he was in the company of Richard Stanley Matthews on a Fayetteville Street, they met a man, whose appearance was similar to that of the defendant, and that, when so confronted by Matthews, the man's eyes "lit up," that is, "showed like he knew the man." The defendant now assigns as error the overruling of his motion to strike this testimony. There is no merit in this assignment. This is but the witness' shorthand description of the

reaction of the other person to meeting Matthews. The emotion displayed by a person on a given occasion is a proper subject for opinion testimony by a non-expert witness. Stansbury, North Carolina Evidence, Brandis Rev., § 129.

[6] There is likewise no merit in the defendant's Assignment of Error to the trial court's denial of his motion that the jury be sequestered during their deliberations. This was a matter in the discretion of the trial court. *State v. Bynum* and *State v. Coley*, 282 N.C. 552, 193 S.E. 2d 725 (1973), *cert. den.*, 414 U.S. 836.

[7] The defendant's Assignment of Error No. 6 is likewise without merit. It is that the court, in its charge to the jury, failed sufficiently to review the evidence solicited on cross-examination of the witnesses Matthews and Carolyn Brown. The law does not require recapitulation of all of the evidence in the charge of the court to the jury. Strong, North Carolina Index 3d, Criminal Law, § 113.1. Furthermore, the record does not show that any alleged omission in the court's recapitulation of the evidence was brought to the attention of the court prior to the jury's retirement to consider its verdict.

The defendant's Assignment of Error No. 7 to the denial of his motion to set aside the verdict and award a new trial for errors committed during the course of the trial was merely formal and requires no discussion.

The defendant's Assignments of Error, originally numbered 5, 8 and 10 have not been brought forward in his brief and are, therefore, deemed abandoned. Rule 28(a), Rules of Appellate Procedure, 287 N.C. 671, 741.

[8] The defendant's first Assignment of Error is the one which he argues most earnestly in his brief. It relates to the denials by Judge McKinnon and by Judge Clark of his successive, pretrial motions that the court order a psychiatric examination of Matthews. The first motion, denied by Judge McKinnon, was "that a court order issue whereby he [Matthews] is to submit himself under proper supervision to a psychiatric examination by a psychiatrist not under the direct control of the State of North Carolina, and that a copy of that report be furnished to the defendant, through his counsel, prior to the trial of this action." The second motion, denied by Judge Clark, was that Matthews be required to undergo a psychiatric examination by a psychiatrist

chosen by the defendant and at the defendant's expense. Judge Clark, after hearing the defendant upon this motion, found as a fact, which finding is not controverted, "that Richard Stanley Matthews received an examination at Dorothea Dix Hospital on March 10, 1975, and a copy of said report has been made available to defense counsel in this case." We find no merit in this assignment of error.

While Matthews' own indictment for this murder was pending in the Superior Court, the court, presumably upon motion of his counsel, ordered him committed to Dorothea Dix Hospital for an examination to determine whether he was competent to stand trial and whether he was able to know right from wrong and the nature and consequences of his actions at the time of the alleged crime. This report, which is set forth in the record, and which Judge Clark found was made available to the defendant's counsel prior to trial, shows the conclusion of the examining psychiatrist, Dr. Taylor, that Matthews was "without psychosis, not insane," and capable of cooperating with his counsel. It also shows the absence of any indication of "psychiatric disorder which would render the patient unable to know right from wrong or unable to know the nature and consequences of his actions." Dr. Taylor, the examining psychiatrist, testified as a witness for the defendant in the present trial. The record does not indicate any objection to or any adverse ruling upon any question propounded to Dr. Taylor by the defendant's counsel.

Stansbury, in his textbook on North Carolina Evidence, says:

" 'The primary purpose of impeachment is to reduce or discount the credibility of a witness for the purpose of inducing the jury to give less weight to his testimony in arriving at the ultimate facts of the case.' *State v. Nelson*, 200 N.C. 69, 156 S.E. 154 (1930). Any circumstance tending to show a defect in the witness's perception, memory, narration or veracity is relevant to this purpose. *** Cross-examination may be employed to test a witness's credibility in such an infinite variety of ways that an attempt to list them would be futile. *** The existence of a mental or physical impairment which would affect the witness's powers of observation, memory or narration, may be shown in order to discredit his testimony. Thus it is proper to show that the witness is mentally deficient, *Moyle v. Hopkins*, 222 N.C. 33, 21 S.E. 2d 826

(1942) ***; *State v. Armstrong,* 232 N.C. 727, 62 S.E. 2d 50 (1950) *** that his memory is weak, or that he was intoxicated at the time of the events about which he has testified." Stansbury, North Carolina Evidence, Brandis Rev., §§ 38, 42, 44.

The defendant does not contend that the trial court rejected any evidence offered by him to discredit the testimony of Matthews or to show that, by reason of mental unsoundness, Matthews was disqualified to testify or that his testimony was not credible. He does not contend that the court erred in allowing Matthews to testify. In *State v. Cade,* 215 N.C. 393, 2 S.E. 2d 7 (1939), this Court, speaking through Justice Barnhill, later Chief Justice, with reference to the testimony of a co-defendant in a trial for murder, said:

"There was evidence that the witness Leon Cody was a person of low mentality and had theretofore been confined in the insane asylum. There was further evidence that he knew right from wrong, and that he had the mentality of a child varying in age from 7½ years to 16 or 17 years. The defendant assigns as error the refusal of the court below to strike the testimony of this witness. The jury heard the testimony as to his mental condition and the court in its charge fully stated the defendant's contention that he was of such mentality that his testimony should not be given any weight or considered adversely to the defendant. Conceding that this witness was of low mentality, it was discretionary with the court as to whether it would permit him to testify. We find nothing in the record that tends to show any abuse of this discretion."

The defendant's contention is that he is entitled to a new trial because the court denied his pretrial motion for an order requiring Matthews to submit to a psychiatric examination by a psychiatrist to be selected by and compensated by the defendant. It is his contention that Matthews' testimony "was the key to the prosecution's case against the defendant," and, consequently, his credibility was a most important factor in the jury's determination of the defendant's guilt, which it was. He further contends that the extreme brutality of the killing shows that Matthews was not "mentally normal," that his subsequent recanting of his

original statement is "evidence of some emotional or mental problem with direct bearing on his credibility" and certain conclusions in the report of Dr. Taylor, above mentioned, raise "serious questions about Mr. Matthews' psychiatric soundness." Therefore, he contends that he had a right to a court order compelling Matthews to submit to a further psychiatric examination designed to determine whether Matthews is a "psychopathic liar."

The defendant contends that the examination of Matthews at Dorothea Dix Hospital, above mentioned, was conducted by a psychiatrist employed by the State and he directs our attention to the Statement of the Supreme Court of New Jersey in *State v. Butler*, 27 N.J. 560, 143 A. 2d 530 (1958), "[I]t is fundamentally unfair for one interested party to obtain an examination by self-selected experts and to oppose a granting of the same right or privilege to the other." This statement has no proper application to the present situation. Here, the examination of Matthews at Dorothea Dix Hospital was not made at the instance of the State for the purpose of building its case against this defendant. It was made in Matthews' own case for the purpose of determining Matthews' capacity to stand trial and his mental responsibility for crime. Furthermore, the examination was made by the staff of a hospital whose primary function is the care and treatment of insane persons. In such a situation the staff of the hospital is in the position of a witness for the court, not a witness for the prosecution. The implied charge of bias against the present defendant in the obtaining of that psychiatric examination has no foundation in fact.

This Court has not previously been called upon to determine the authority of a trial court of North Carolina to order a psychiatric examination of a proposed witness or to determine, if such authority exists, how such order is to be enforced. It is to be observed that the denial of the defendant's motion for such order by Judge Clark was not upon the ground that the court lacked the authority to make such order but upon the ground that, under the circumstances of this case, such order would not be issued.

Examination of decisions of courts in other states of the Federal courts discloses that in a number of these jurisdictions some authority in the trial court to enter such an order is recognized, but its extent and the circumstances which justify its exercise are not matters as to which these courts have agreed.

The issuance of orders requiring a witness to submit to a psychiatric examination before testifying is a matter of relatively recent development. If it did not originate therein, it received its chief impetus in Dean Wigmore's pronouncement: "No judge should ever let a sex offense charge go to the jury unless the female complainant's social history and mental makeup have been examined and testified to by a qualified physician." 3 Wigmore, Evidence, § 924a. Notwithstanding our great respect for this eminent authority on the law of Evidence, this statement never has been and is not in accord with the law of this State and is, in our opinion, completely unrealistic and unsound.

Obviously, there are types of sex offenses, notably incest, in which, by the very nature of the charge, there is grave danger of completely false accusations by young girls of innocent appearance but unsound minds, susceptible to sexual fantasies and possessed of malicious, vengeful spirits. These are, however, but a small proportion of the sex offenses brought to trial in the courts of this State and, even as to these, our observation leads us to believe that the typical jury is not so naive in such matters as Dean Wigmore appears to have thought.

Our examination of the decisions of courts which have asserted the authority of a trial court to order a psychiatric examination of a proposed witness indicates that, in the earlier decisions, the practice was largely limited to cases of sex offenses and to examination of the alleged victim. Apparently, these courts were persuaded by the Wigmore view that adolescent females are particularly subject to mental unsoundness and, therefore, likely to be guilty of pathological perjury in connection with accusations of sexual abuse practised upon them. With the current rise in homosexual offenses and other recent sociological developments, it would seem reasonable to suppose that these courts would now apply the same rules to the alleged male victims of sex offenses.

The leading case upon the subject is *Ballard v. Superior Court of San Diego County*, 64 Cal. 2d 159, 410 P. 2d 838, 18 A.L.R. 3d, 1416 (1966). There the defendant, a physician charged with rape of a patient to whom he allegedly administered an anesthetic in order to prevent resistance, sought a psychiatric examination of his female accuser. The decision of the California court was that "although the trial court may in its discretion order a *complaining* witness *in a sex violation case* to submit to a

psychiatric examination, the prosecutrix in the instant case should not presently be required to undergo such an examination." 410 P. 2d at 840-41. (Emphasis added.) The Court, speaking through Justice Tobriner, said:

> "A number of leading authorities [text books, law review articles and a report of the American Bar Association Committee on the Improvement of the Law of Evidence] have suggested that in a case in which a defendant faces a charge of sex violation, the complaining witness, if her testimony is uncorroborated, should be required to submit to a psychiatric examination.

> \* \* \*

> "The courts in this state, however, *in cases not involving sex violations, have rejected psychiatric testimony* as to the mental or emotional condition of a witness for purposes of impeachment.

> \* \* \*

> "We do not mean to suggest that psychiatric testimony of the mental and emotional condition of the prosecutrix must necessarily be admitted in every case. We recognize that psychiatric evaluation is not absolute but only relatively illuminating; its utility in the ascertainment of the prosecutrix' condition must depend upon its posture in the whole picture presented to the trial court. That court can properly determine *in its discretion* whether psychiatric testimony as to the mental and emotional condition of the complaining witness *should be admitted.*

> \* \* \*

> "[A] general rule requiring a psychiatric examination of complaining witnesses in every sex case or, as an alternative, in any such case that rests upon the uncorroborated testimony of the complaining witness would, in many instances, not be necessary or appropriate. Moreover, victims of sex crimes might be deterred by such an absolute requirement from disclosing such offenses.

> "Rather than formulate a fixed rule in this matter we believe that discretion should repose in the trial judge to

order a psychiatric examination of the complaining witness in the case involving a sex violation if the defendant presents a compelling reason for such examination.

\*　\*　\*

"We therefore believe that the trial judge should be authorized to order the prosecutrix to submit to a psychiatric examination if the circumstances indicate a necessity for an examination. Such necessity would generally arise only if little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity. Thus, in rejecting the polar extremes of an absolute prohibition and an absolute requirement that the prosecutrix submit to a psychiatric examination, we have accepted a middle ground, placing the matter in the discretion of the trial judge.

\*　\*　\*

"*The complaining witness should not, and realistically cannot, be forced to submit to a psychiatric examination or to cooperate with a psychiatrist. In the event that the witness thus refuses to cooperate, however, a comment on that refusal should be permitted.*" 410 P. 2d at 846-49. (Emphasis added throughout.)

It will be observed that the law of this State differs from that of California, in general, as to the admissibility of properly obtained evidence of a witness' psychiatric abnormalities. Here, we are not concerned with the admissibility of such evidence, but with how it may be obtained.

In *State v. Franklin*, 49 N.J. 286, 229 A. 2d 657 (1967), the question arose in the review of a conviction for murder unrelated to a sex offense. A witness for the state refused to submit to a psychiatric examination. The defendant's motion for an order compelling her to do so was denied by the trial court. The Supreme Court of New Jersey said:

"There can be no question of the power of the court to order such an examination. [Citing *State v. Butler*, 27 N.J. 560, 604, 143 A. 2d 530 (1958)]. We believe such an examina-

tion should have been ordered here." Franklin, 229 A. 2d at 658.

The witness in question in this New Jersey case was an adult woman alcoholic who had previously been committed to mental institutions because of her heavy drinking. The Supreme Court remanded the matter to the trial court with instructions that the trial judge direct the witness to submit herself to a psychiatrist for a psychiatric examination, that the court should take the testimony of the psychiatrist and, thereupon, report to the Supreme Court as to whether he found the witness competent and, if so, to comment upon whether such further evidence could have changed the result of the trial. The trial judge, following this direction, reported to the Supreme Court that he found such additional evidence would not have affected the outcome of the trial. On the second appeal, *State v. Franklin*, 52 N.J. 386, 245 A. 2d 356, 363 (1968), the Supreme Court of New Jersey concluded that the trial judge "in cutting short the defense counsel's cross-examination of Miss Pitts when he sought to affect her credibility, visited substantial prejudice on defendant," observing that the jury did not have the benefit "of what we now know of [the witness'] drinking habits, the physical and mental effects of alcohol upon her (including hallucinating), and her hospital admissions, so that it could reach an informed judgment as to whether her testimony was to be believed." Consequently, the Supreme Court on the second appeal reversed the conviction and ordered a new trial in which the defendant would have the "fullest opportunity to develop all available facts relating to [the witness'] drinking on the night of [the alleged offense] and prior thereto, the history of her addiction to alcohol and the effects which drinking had upon her, including the need for institutional treatment."

Had the *Franklin* case arisen in this State, it would clearly have been proper for defense counsel in cross-examining the witness, or by offering through other witnesses evidence, otherwise admissible, to impeach her credibility by showing her drinking habits and past commitments to institutions on that account. This, of course, is an entirely different matter from requiring the witness to submit to a psychiatric examination against her will.

Likewise, in *State v. Butler*, 27 N.J. 560, 143 A. 2d 530 (1958), the question arose in a trial for homicide unrelated to a sex of-

fense. The witness was a participant who testified for the state against the defendant. Speaking through Justice Francis, the Supreme Court of New Jersey said:

"Coleman's [the witness] mental competency and credibility were of transcendent importance.

"Prior to trial both the State and the defense learned that Coleman had been a mental patient in the Crownsville State Hospital in Maryland.

\*  \*  \*

"In advance of the trial date defendants applied to the court for an order for psychiatric examination. The State, aware of Coleman's impending appearance as its witness, arranged for such an examination in its own interest, with his consent and that of his counsel. The prosecutor opposed the defendant's motion and Coleman's attorney indicated that he would not consent. \*\*\* The court denied the request, declaring \*\*\* that he would give the defendants such portions of the reports of the State's doctors as would show their opinion on this subject. \*\*\* However, they do not appear to have received copies of any portions of the medical reports. The undisputed facts are that the reports were privately submitted to the trial court, who considered them *ex parte* and concluded that Coleman was competent to testify. He decided also that the defendants' motions for copies of the reports should be denied.

\*  \*  \*

"*When reasonable ground for doubt as to a person's mental capacity as a witness becomes known to the parties and to the court, and lives may depend upon his testimony,* the proper administration of justice in the public interest ought to stimulate a cooperative voluntary effort to establish a means of mutual solution of the problem. A variety of methods suggest themselves: agreement (a) that the court may appoint an impartial expert, (b) that each party may select one expert and the court a third, for joint examination, or (c) that each party may engage the services of an independent expert. \*\*\* *In such a situation it is fundamentally . unfair for one interested party to obtain an examination by*

*self-selected experts and to oppose the granting of the same right or privilege to the other.*" 143 A. 2d at 552-53. (Emphasis added.)

In the Butler case, the New Jersey Court appears to have overlooked the right of the witness in its appropriate concern for fair play as between the prosecuting attorney and defense counsel.

The rule in Connecticut appears to be that a court has no authority to compel a witness to submit to a psychiatric examination until he is actually offered as a witness, and not then unless there is some indication of insanity. *Taborsky v. State*, 142 Conn. 619, 116 A. 2d 433 (1955).

The Supreme Court of Oregon first rejected the view that a trial court has power to order even the complaining witness in a sex case to undergo a psychiatric examination. *State v. Walgraeve*, 243 Ore. 328, 412 P. 2d 23 (1966). The Court there said that to hold otherwise would invade the province of the jury to evaluate the credibility of witnesses, by subjecting the testimony of the witness to attack by expert opinion based upon an interview conducted outside the presence of the jury. It was also of the opinion that a parade of experts, with conflicting opinions, would confuse rather than enlighten the jury, would delay the trial and would distract the jury from the issue of the guilt or innocence of the accused and that, rather than undergo such examination, timid victims of crime would simply not report such crimes to the police. The Court said that such a fundamental change in policy should come from the Legislature. However, two years later, in *State v. Clasey*, 252 Ore. 328, 446 P. 2d 116, 117 (1968), a sex offense case, the Court apparently approved the California rule, in principle, but affirmed the denial of the defendant's motion for such order on the ground that "there was no compelling reason stated in the motions and there was corroboration of the victim's testimony."

In *State v. Kahinu*, 53 Haw. 536, 547, 498 P. 2d 635 (1972), *cert. den.*, 409 U.S. 1126, 35 L.Ed. 2d 258, 93 S.Ct. 944 (1973), The Supreme Court of Hawaii, in a case involving burglary and assault with intent to rape, said that a trial judge, in his discretion, may order a witness to take a psychiatric examination when the movant shows a compelling reason therefor, but the trial

court had properly refused to order such an examination when the motion therefor was "based upon nothing more compelling than a bald allegation that the complainant may be mentally ill."

In *Easterday v. State*, 254 Ind. 13, 256 N.E. 2d 901 (1970), the alleged offense was sodomy committed on a 10-year-old girl who had previously accused other men of acts of sexual misconduct, including her brothers and an uncle, and who admitted "telling stories" about such activities. The Court said:

"From the above cited cases, it is apparent that the defendant has no right to subject a prosecuting witness, in a trial on a sex offense, to a psychiatric examination. The trial court can, however, on timely motion of the defendant, order such an examination where in its sound discretion it determines one to be necessary." 254 Ind. at 16-17, 256 N.E. 2d 903.

The Court then held that, under the peculiar circumstances of that case, the refusal to grant the request for a psychiatric examination of the prosecutrix was not "based on sound judicial discretion," and a new trial was ordered.

In *State v. Miller*, 35 Wis. 2d 454, 151 N.W. 2d 157 (1967), the Supreme Court of Wisconsin found no abuse of discretion in the trial court's denial of a motion for a pretrial psychiatric examination of the complaining witness in a sex offense case. Speaking through Justice Beilfus, it said:

"As pointed out in *Goodwin* [*v. State*, 114 Wis. 318, 90 N.W. 170 (1902)] in cases where the court has serious doubt of the mental capacity of a witness, in the exercise of its sound judicial discretion, it can order the witness to submit to a medical examination *as a condition of allowing the witness to testify. Of course the witness might refuse, but there is no power in the court to compel such an examination.* (Emphasis added.)

"Because of the possible indignity of such an examination and the natural reluctance of persons to appear as witnesses if they were to be subjected to such examination, we believe a strong and compelling reason should appear before a trial court in the exercise of its discretion should

order a medical examination even as a condition of testifying at the trial." 35 Wis. 2d at 471, 151 N.W. 2d at 165.

In these Wisconsin cases, the court appears to have been dealing with an examination to determine the witness' competency to testify rather than one to relate to the credibility to be accorded a competent witness.

In *People v. Glover*, 49 Ill. 2d 78, 273 N.E. 2d 367 (1971), the defendant was charged with an unnatural sex assault on an adult woman. The Court said, "There is no question of the court's jurisdiction to order an examination of the complaining witness in a case involving a sex violation *** and it may, in the exercise of its discretion, do so when the defendant presents a compelling reason therefor." 49 Ill. 2d at 82, 273 N.E. 2d at 370. However, the Court held that, under the circumstances of that particular case, there was no abuse of discretion in denying the motion.

In *State v. Klueber*, 81 S.D. 223, 132 N.W. 2d 847 (1965), the defendant was convicted of indecently molesting a 12-year-old child. The Court said:

"In an article entitled Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach, in Vol. 48 Cal. L. Rev. 648, at page 663, this conclusion is reached: 'Most of the courts which have dealt with this problem have recognized the authority of the trial judge to order a psychiatric examination *of a witness on the question of credibility*. The principle established by the majority of the cases is that the judge has the discretion to order such an examination, although the failure to do so has rarely been held an abuse of discretion.' We are not aware of any good reason why that should not be the rule concerning *complaining witnesses in sex offenses*. *** We think defendant's showing for the requested examination falls far short of this requirement." 81 S.D. at 229-30, 132 N.W. 2d at 850. (Emphasis added.)

In *United States v. Skillman*, 442 F. 2d 542 (8th Cir., 1971), and in *United States v. Russo*, 442 F. 2d 498 (2d Cir., 1971), *cert. den.*, 404 U.S. 1023, 30 L.Ed. 2d 673, 92 S.Ct. 669 (1972), the courts of appeal found no abuse of discretion in the denial by the District Judge of a motion for the psychiatric examination of a witness,

neither case involving a sex offense. In the *Russo* case, Circuit Judge Moore said, "Ordering a witness to undergo a psychological examination is a drastic measure." 442 F. 2d at 503.

In *United States v. Barnard*, 490 F. 2d 907 (9th Cir., 1973), *cert. den.*, 416 U.S. 959, 40 L.Ed. 2d 310, 94 S.Ct. 1976 (1974), Circuit Judge Duniway, speaking for the Court said:

> "As we have seen, competency [of a witness] is for the judge, not the jury. Credibility, however, is for the jury — *the jury is the lie detector in the courtroom.* *** It is now suggested that psychiatrists and psychologists have more of this expertise than either judges or juries, and that their opinions can be of value to both judges and juries in determining the veracity of witnesses. *Perhaps.* The effect of receiving such testimony, however, may be two-fold: first, it may cause juries to surrender their own common sense in weighing testimony; second, it may produce a trial within a trial on what is a collateral, but still an important matter. For these reasons we, like other courts that have considered the matter, are unwilling to say that when such testimony is offered, the judge must admit it." 490 F. 2d at 912-13. (Emphasis added.)

As above noted, such testimony, if otherwise competent, would be admissible in North Carolina, to bear upon the credibility of the witness.

In Massachusetts the trial judge is given, *by statute*, the power, in his discretion, to order such examination of a witness. *Commonwealth v. Welcome*, 348 Mass. 68, 201 N.E. 2d 827 (1964). Nevertheless, in the *Welcome* case, which involved an indecent assault on a 7-year-old girl, the Supreme Judicial Court of Massachusetts found no error in the trial court's denial of the motion for such examination.

We perceive no sound basis for distinction, in this matter, between cases involving sex offenses and cases involving other crimes, between male and female witnesses, youthful and adult witnesses, complaining witnesses and other witnesses, witnesses for the State and witnesses for the defendant.

To require a witness to submit to a psychiatric examination, by a psychiatrist not selected by the witness, is much more than

a handicap to the party proposing to offer him or her. It is a drastic invasion of the witness' own right of privacy. To be ordered by a court to submit to such an examination is, in itself, humiliating and potentially damaging to the reputation and career of the witness.

The courts which have adopted the view that such an examination may be ordered have not laid down any guidelines for the protection of the witness. Is the witness entitled to the presence of counsel at such examination? Must counsel be afforded an indigent witness? A person, voluntarily consulting a psychiatrist of his own choice, may refuse to answer what he or she deems an impertinent question delving into his or her private, personal affairs and history. What, if any, limitations are or should be imposed upon the questioning of a witness by a psychiatrist pursuant to such a court order? If the defendant obtains such an order, is the District Attorney entitled to insist upon an examination by his expert? Where there are multiple defendants, is each entitled to an examination of his alleged victim by his own psychiatrist?

As the California, Connecticut, and Wisconsin Courts have observed, the court has no actual authority to compel the witness to cooperate with the psychiatrist, but the ordinary witness does not know this and will be fearful of refusing to do so. To require the alleged victim, especially in a sex offense case, to submit to such an inquisition into her most personal and private relations and past history, as a condition precedent to permitting her to testify against her alleged assailant would certainly discourage the honest, innocent victim of a genuine assault from going to the authorities with a complaint. This is not in the public interest. A zealous concern for the accused is not justification for a grueling and harassing trial of the victim as a condition precedent to bringing the accused to trial.

The danger of perjury is always present in any trial but as Circuit Judge Duniway observed in *United States v. Barnard*, *supra*, at 912, "The jury is the lie detector in the courtroom." Even pathological liars sometimes tell the truth. It is for the jury to determine in the particular case whether the particular witness is or is not telling the truth. Assuming a psychiatric examination of the witness has been made, the examining psychiatrist cannot make that determination but can only express

State v. Looney

his opinion as to whether the witness, by reason of the psychiatrist's opinion as to his mental health, is more or less likely to tell the truth than is a person in normal mental health.

To hold that a trial court in this State may require a witness, against his will, to subject himself to a psychiatric examination, as a condition to his or her being permitted to testify, is also a serious handicap to the State in the prosecution of criminal offenses. If the witness simply refuses, there may well be nothing the prosecuting attorney can do to induce the witness to comply with the order. In many instances, a material witness for the State is none too eager to testify under any circumstances. To permit the defendant to obtain a court order, directing him or her to submit to a psychiatric examination as a condition precedent to his testifying, may well further chill his or her enthusiasm for taking the stand or at least give him a way out of doing so. In many cases, there would be no insurmountable difficulty in the way of a hard-pressed defendant's obtaining such an order and bringing this escape route to the attention of the witness.

[8] In our opinion, the possible benefits to an innocent defendant, flowing from such a court ordered examination of the witness, are outweighed by the resulting invasion of the witness' right to privacy and the danger to the public interest from discouraging victims of crime to report such offenses and other potential witnesses from disclosing their knowledge of them.

We think that so drastic a change in the criminal trial procedure of this State, if needed, should be brought about, as was done in Massachusetts, by a carefully considered and drafted statute, not by our pronouncement leaving the matter to the unguided discretion of the trial judge.

[9] If, however, we were to hold that judges of trial courts in North Carolina have inherent power, in their discretion, to order an unwilling witness to submit to a psychiatric examination, we would hold that, under the circumstances of the present case, it was not an abuse of that discretion to deny the motion of this defendant. In the present case, unlike many cases of alleged sex offenses, the question was not whether the offense of murder occurred but whether the defendant was a party thereto. The State's witness Matthews had already been given a psychiatric examination by the staff of Dorothea Dix Hospital and its report

State v. Looney

was available to the defendant, as was the testimony of the ex-amining psychiatrist. Without a further psychiatric examination, the defendant was in a position to show that the witness had com-mitted the murder with exceptional brutality, which, as the de-fendant says in his brief, indicates his mental abnormality. The defendant was further in a position to show that this witness originally gave the police a statement completely at variance with his present testimony and recanted that statement in exchange for permission to plead guilty to second degree murder. There is in this case no showing of any compelling necessity for a further psychiatric examination of Matthews in order to enable the de-fendant to present to the jury his contention that Matthews' testimony was not worthy of their belief.

We, therefore, conclude that there was no error in the denial of the defendant's motions for an order directing the pretrial psychiatric examination of Matthews. The defendant's Assign-ment of Error No. 1 is, therefore, overruled.

No error.

Justice EXUM concurring.

As have most of the well-considered decisions on the subject, to which the majority refers, I would conclude that our trial judges have the power, to be carefully used in the exercise of their sound discretion, to order in appropriate circumstances the psychiatric examination of any witness as a condition to receiving the testimony of that witness. In this case the denial of defend-ant's motion for such an examination was well within the discre-tion of the trial judge and should not be held for error.

As the majority wisely recognizes the witness' rights must be given due consideration. Defendant should be required to make a strong showing that the witness' mental make up is such that a psychiatric examination would probably reveal either that the witness is incompetent or that the witness' credibility may be subject to serious question. Situations calling for the entry of such an order would, it seems, be rare indeed. But if called for, our judges should have the power to enter the order.