STATE v. IRVIN K. BASS.

(Filed 16 June, 1961.)

**1. Mayhem § 1—**

At common law, mayhem was a crime even though the injuries were self-inflicted or purposefully inflicted by another upon a consenting victim, in which instance both parties were guilty, and malice aforethought was required under the common law only in cases involving the cutting out of the tongue or the putting out of an eye.

**2. Same—**

Under G.S. 14-29 the elements of the offense of mayhem are the same as under the common law, and the consent of the victim does not constitute a defense in a prosecution under the statute, notwithstanding that the statute does not by express terms include such acts as are done with the consent of the victim.

**3. Criminal Law § 10—**

An accessory before the fact need not be the originator of the plan to commit the offense, but a person is an accessory before the fact if, with knowledge of the intent of the principal to commit the offense, he gives advice or counsel to the principal with regard to a proposed line of conduct, or does some act in aid to the principal in committing the offense, and is not actually present when the offense is committed. G.S. 14-5.

**4. Same: Mayhem § 2—**

Evidence tending to show that defendant, although he refused to cut off the fingers from the hand of another, deadened the fingers of such other with a hypodermic injection and furnished such other a tourniquet and instructed him in its use, all with knowledge that such other intended to have his fingers cut off to collect insurance money, which intent was actually carried out, is sufficient to make out a *prima facie* case against defendant as an accessory before the fact to mayhem.

**5. Same—**

It is immaterial that the person who actually cut off the victim's

fingers was not present when defendant deadened the victim's fingers with a hypodermic injection and instructed the victim how to use a tourniquet to stop the flow of blood after the commission of the act, since the counsel given the victim and communicated by the victim to the principal was in effect given by defendant to the principal through the agency of the victim.

**6. Mayhem § 2—**

In this prosecution of defendant as an accessory before the fact to mayhem, the evidence tended to show that at the time defendant counselled and aided the victim, the victim desired to have his fingers cut off to collect insurance money, but the evidence was conflicting as to whether, at the time the actual perpetrator cut off the victim's fingers, he did so at the request of the victim or whether he did so over the objection of the victim, the victim having changed his mind. *Held:* Conflict in the evidence as to whether the offense as committed was the one which defendant aided and counselled, does not justify nonsuit.

**7. Criminal Law § 101—**

When the substantive evidence offered by the State is conflicting, some tending to inculpate and some tending to exculpate defendant, it is sufficient to withstand motion for nonsuit.

APPEAL by defendant from *Mallard, J.,* October 1960 Term of ALAMANCE.

This is a criminal action.

The indictment charges that defendant on 2 July 1960 "did unlawfully, wilfully and feloniously be and become an accessory before the fact to the felonious maiming of Walter Rogers, which maiming was done by James Bryson by feloniously, wilfully and unlawfully cutting off on purpose but without malice aforethought four fingers on the left hand of Walter Rogers, with intent to maim the said Walter Rogers, said (defendant) having administered to said Walter Rogers a local anesthetic . . . ."

Plea: Not guilty.

The State's evidence tends to show:

Defendant, I. K. Bass, is a physician, licensed by the State of North Carolina, and resides at Reidsville. On 19 February 1960 defendant deadened the fingers of George Bryson by hypodermic injection. Bryson told defendant he was going to cut off his fingers to get insurance money. Defendant had previously refused to amputate the fingers. While his fingers were deadened by the injection they were cut off by his brother, James Bryson, with an electric skill saw. On 2 July 1960 George Bryson and Walter Rogers went to Reidsville and requested defendant to deaden Rogers' fingers. Defendant refused until he was paid $65.60, amount due him by George Bryson for former services, and $29.00 for deadening Rogers' fingers. These amounts

were paid. Defendant told Rogers he was foolish to cut off his fingers, but if he was fool enough to do it defendant would inject the fingers. George Bryson "made it plain" to defendant that he wanted Rogers' fingers injected so he would not feel pain when the attempt was made to cut off his fingers. Defendant injected Rogers' fingers with procaine which was somewhat diluted, gave him a rubber tourniquet to stop the flow of blood after his fingers had been cut off, and showed him how to apply and use it. Some two or three hours later at Rogers' home in Burlington, James Bryson, at Rogers' request, cut off four fingers on Rogers' left hand, using an electric skill saw. Rogers testified: ". . . (I) went in the room and tried to hide from him (George Bryson). . . . (I) did tell him two or three times I didn't want them cut off and I was not going to cut them off. . . . There was feeling in my fingers. . . . I did not ask James Bryson to cut them off. I asked him not to cut them off and I told him I did not want my fingers cut off. He cut them off anyhow."

Verdict: Guilty.

Judgment: Six months prison term, suspended on conditions.

Defendant appeals.

*Attorney General Bruton and Assistant Attorney General Rountree for the State.*

*Bethea and Robinson for defendant.*

MOORE, J.    Defendant assigns as error the refusal of the court to grant his motion for nonsuit made at the close of the evidence. Defendant insists that there are at least three phases and circumstances of the case which make nonsuit mandatory, and that either of these is sufficient for dismissal.

(1) It is contended that Rogers consented to the maiming and that because of this consent the act of James Bryson in cutting off Rogers' fingers is not a violation of G.S. 14-29 upon which the indictment is based. Defendant argues that at common law mayhem, in cutting off fingers or other members of the body, when self-inflicted or inflicted upon one's consenting, was a punishable criminal offense only when done with malice aforethought, that G.S. 14-29 applies to such mayhems only when done without malice aforethought and when inflicted by one person upon another, that the statute alters, abrogates and replaces the common law and therefore there can be no crime of "maiming without malice aforethought where the person alleged to have been maimed has requested that the act of maiming be committed upon him."

This contention requires that we trace briefly the development and

application of the law relating to mayhem from the early days in England and from the colonial period to the present day in North Carolina.

To the early writers on English law the "common law" meant those rules which by custom, usage and court decision, and not by act of Parliament, had come to be recognized as the law of the land. At common law, as thus understood, "mayhem, *mayhemium,* was in part considered . . . as a civil injury; but it is also looked upon in a criminal light by the law, being an atrocious breach of the king's peace, and an offense tending to deprive him of the aid and assistance of his subjects. For mayhem is properly defined to be, as we may remember, the violently depriving another of the use of such of his members as may render him less able in fighting, either to defend himself, or to annoy his adversary. And therefore the cutting off, or disabling, or weakening a man's hand or finger, or striking out his eye or fore-tooth, or depriving him of those parts the loss of which in all animals abates his courage, are held to be mayhems. But the cutting off his ear, or nose, or the like, are not held to be mayhems at common law; because they do not weaken but only disfigure him." Chitty's Blackstone, Book IV, C. XV, pp. 205-206.

"Note, the life and members of every subject are under the safeguard and protection of the king . . . to the end that they may serve the king and their countrie, when occasion shall be offered. Nay, the lord of the villiene, for the cause aforesaid, cannot mayheme the villiene, but the king shall punish him for mayheming of his subject (for that hereby he hath disabled him to do the king service) by fine, ransome, and imprisonment, until the fine and ransome be paid." 1 Coke Upon Littleton (1st Amer. from 19th London Ed., 1853), s. 194.

". . . (T)he common law elements of Mayhem are (1) depriving; (2) anyone; (3) maliciously; (4) of a corporal member useful for fighting." Burdick: Law of Crime (1946), Vol. 2, s. 401, p. 71.

". . . (I)n order to found an indictment or appeal of mayhem the act must be done maliciously; though it matters not how sudden the occasion." 1 East, P. C., Ch. VII, s. 1, p. 393 (1803).

". . . (A)t common law . . . the injury must be done wilfully and maliciously; but it is not necessary that it shall be premeditated. It may be inflicted in a sudden affray." Clark and Marshall: Crimes (5th Ed.), s. 219, p. 288.

"Malice, according to the authorities, was an essential element in mayhem at common law." *State v. Wilson,* 188 N.C. 781, 125 S.E. 612 (1924).

Blackstone continues comment: "By the ancient law of England he that maimed any man, whereby he lost any part of his body was

sentenced to lose the like part; *membrum pro membro* . . . . But this went afterwards out of use. . . . So that, by the common law, as it for a long time stood, mayhem was only punishable by fine and imprisonment . . . ." Chitty's Blackstone, Book IV, Ch. XV, p. 206.

"But subsequent statutes have put the crime and punishment of mayhem more out of doubt. For first, by statute 5 Henry IV, C. 5. to remedy a mischief that then prevailed by beating, wounding, or robbing a man, and then cutting out his *tongue,* or putting out his eyes, to prevent him from being an evidence against them, this offense is declared to be a felony, if done of malice prepense; that is, as Sir Edward Coke explains it, voluntarily, and of set purpose, though done upon a sudden occasion." *ibid,* p. 206.

Thus, after 5 Henry IV (1404), the cutting out of a tongue or putting out of eyes was a felony if done with malice aforethought. Other acts of malicious maiming were aggravated misdemeanors. Except for minor modifications, not of interest here, this was the status of the law of mayhem until 1683.

As thus defined, mayhem was a crime at common law when self-inflicted, and if inflicted by another upon a consenting victim both were guilty of mayhem. It is clear that this was true regardless of whether malice or malice aforethought was involved. A case was tried and decided in 1603 which is remarkably similar to the case at bar. It is universally accepted as precedent and has been repeatedly cited as authoritative. In Lord Coke's commentaries it is reported in these words: ". . . (I)n my circuit in *anno* 1 *Jacobi regis,* in the County of Leicester, one Wright, a young strong and lustie . . . . rogue, to make himselfe impotent, thereby to have the more colour to begge or to be relieved without putting himselfe to any labour, caused his companion to strike off his left hand; and both of them were indited, fined and ransomed therefore, and that by the opinion of the rest of the justices for the cause aforesaid." 1 Coke upon Littleton (1st Amer. from 19th London Ed., 1853), s. 194.

". . . (A) person who even maims himself, or procures another to maim him, that he may have more colour to beg; or disables himself to prevent being pressed for a soldier; is subject to fine and imprisonment at common law; and so is the party by whom it was effected at the other's desire." 1 East, P. C., Ch. VII, s. 4, p. 396 (1803). Also see 1 Hale, P. C., Ch. XXXI, p. 412 (New Ed. 1778) in which the *Wright* case is cited.

". . . (T)here is self-murder, or suicide, at common law, and, logically, there may be self maiming also. In fact, this principle was recognized in an old English case (*Wright's* case) where it was held that if one maimed himself, or procured another to maim him, both the

injured person and the one by which the act was done were guilty."
Burdick: Law of Crime (1946), Vol. 2, s. 403, p. 74.

"Consent of the person maimed is no defense. If a man procures
another to cut off his hand, both are guilty." Clark and Marshall:
Crimes (5th Ed.), s. 218, p. 288.

"According to the common law, a person could not rightfully take
his own life. If he did so, he became guilty of murder. The law also
prohibited self-maiming. Consequently, the consent of one given to
another, either to kill or maim, was ineffective to prevent criminal
liability on the part of the latter. Although suicide is no longer a
crime in most jurisdictions, the rule still prevails that consent to a
killing or maiming does not prevent its being criminal." Miller on
Criminal Law (1934), s. 57(b), p. 172.

The question of the effect of consent of one given to another to
maim, on the guilt or innocence of the person committing the act, has
not heretofore been presented to this Court. The common law pre-
vails in this State unless changed by statute. Such consent in the in-
stant case is no defense to the action against defendant unless, as
contended by him, statutory changes have necessarily abrogated the
common law rule.

The last statute enacted by Parliament relative to mayhem prior
to the delivery of Blackstone's commentaries was the Coventry Act.
He said: "The last statute, but by far the most severe and effectual of
all, is that of 22 & 23 Car. II, C. 1, called the Coventry act; being
occasioned by an assault on Sir John Coventry in the street, and slit-
ting his nose, in revenge (as was supposed) for some obnoxious words
uttered by him in Parliament. By this statute it is enacted, that if
any person shall of malice aforethought, and by lying in wait, un-
lawfully cut out or disable the tongue, put out an eye, slit the nose,
cut off a nose or lip, or cut off or disable any limb or member of any
other person, *with intent to maim or disfigure him;* such person, his
counsellors, aiders, and abettors, shall be guilty of felony without
benefit of clergy." Chitty's Blackstone, Book IV, Ch. XV, p. 207. See
also Pickering's Statutes at Large, Vol. VIII, pp. 331-334.

At the time of the passage of the Coventry Act the colonization of
what is now North Carolina was underway. Indeed the Carolinas
were named in honor of Charles II. The common law of England pre-
vailed in the Colony. The law of mayhem as it existed prior to the
passage of the Coventry Act, and as it existed at the time of the
Wright decision, was the law of the Colony until 1749. The Coventry
Act "was adopted in North Carolina, 16 October 1749 (23 State Rec-
ords, 324), but was superseded by the act of 1754 (North Carolina
Assembly), which provided 'That if any person or persons . . . , on

purpose, shall unlawfully cut out or disable the tongue, put out an eye, slit the nose, bite or cut off a nose or lip, bite or cut off or disable any limb or member of any subject of his Majesty in so doing to maim or disfigure in any of the manners before mentioned such his Majesty's subjects,' etc." Second parentheses ours. *State v. Wilson, supra,* 783. See also 1 Potter: Code of North Carolina, Ch. 56, p. 194.

The Assembly thus repealed the Coventry Act and reinstated the common law as it existed, even prior to the act of 5 Henry IV, adding only acts done with intent to disfigure.

"In 1791, this act (of 1754) was repealed and the following statutes were enacted: 1. 'That if any person or persons shall of malice aforethought unlawfully cut out or disable the tongue, or put out an eye of any person with intent to murder, maim or disfigure, the person or persons so offending, their counsellors, abettors and aiders, knowing of and privy to the offense as aforesaid, shall for the first offense,' etc. 2. 'That if any person or persons shall on purpose unlawfully cut or slit the nose, bite or cut off a nose or lip, bite or cut off an ear, or disable any limb or member of any other person with intent to murder, or to maim or disfigure such person in any such case the person or persons so offending shall be imprisoned,' etc." *State v. Wilson, supra,* 783. See also 1 Potter; Code of North Carolina, Ch. 339, pp. 658, 659.

The first section of the act of 1791 relates to the cutting out and disabling of the tongue and putting out of an eye with malice aforethought. In essential substance it re-enacts 5 Henry IV, C. 5 (1404). Section 2, except for the matters dealt with in section 1, is essentially the same as the act of 1754 and the old common law of England. Section 1 is in all essential elements our present G.S. 14-30. Except for one modification which will be discussed later, section 2 is in all material aspects our present G.S. 14-29, upon which the bill of indictment was based in the instant case.

After the passage of the act of 1791 lawyers became concerned as to whether, from the wording of section 2, *malice aforethought* was necessary for guilt and conviction under that section and, if not, whether *malice* was an essential ingredient of the offense under section 2 (G.S. 14-29). *Ruffin, J.* (later *C. J.*), answered these questions in *State v. Crawford,* 13 N.C. 425. Here defendant was charged with biting off an ear under section 2 of the act (G.S. 14-29). The court held that *malice aforethought* had no application, but that *malice* was an ingredient of the offense. It said: "But even if the argument for the Defendant be allowed, so far as to make malice a necessary ingredient of each criminal act, forbidden in either section, it may well

be asked, what is malice, in reference to this subject? Does it mean an actual, express, or preconceived disposition to do his adversary the particular injury inflicted? I suppose not. But it is used in that enlarged and legal sense, which imports the intent or disposition, at the moment, to do, without lawful authority, and without necessity, that which the law forbids. And how does an act, done on purpose, and without the pressure of necessity, differ from that? To me it seems, that if it is done on purpose, it is done with malice, . . . ."

Parenthetically, the English Parliament repealed the Coventry Act in 1829 and enacted 9 Geo. IV, C. 31, s. XII, the provisions of which are quite similar to the North Carolina Act of 1754. Pickering's Statutes at Large, 9 Geo. IV, pp. 103-104.

In 1831 the North Carolina Assembly passed an act relating to castration. Acts of the General Assembly, session 1831-1832, Ch. XL. A portion of this act is codified as G.S. 14-28. The remainder of the act was merged with section 2 of the act of 1791 (G.S. 14-29) in 1837. Except for modification as to punishment, the statute (now G.S. 14-29) took final form. It is, in material part, as follows: "If any person shall, *on purpose* and unlawfully, *but without malice aforethought*, cut or slit the nose, bite or cut the nose, or a lip or an ear, or disable any limb or member of any other person, or castrate any other person, or cut off, maim or disfigure any of the privy members of any other person, with intent to kill, maim, disfigure, disable or render impotent such person, the person so offending shall be imprisoned . . . ." (Emphasis added)

The material alteration in 1837 was the addition of the words "without malice aforethought." There was the impression in some quarters that these added words removed *malice* as an essential element of the offense. This is the basis of the contention of defendant in the instant case. He takes the position that the common law was hereby completely abrogated and since the statute does not by express terms include such acts as are done with the consent of the victim, there was no violation in this case. The meaning and effect of the words "without malice aforethought" were construed by *Ruffin, C.J.,* as follows: "It is thus seen that those words '*without malice aforethought*,' which were not in the second section of the act of 1791, are introduced into the revised act of 1837 — doubtless with the view of giving expressly to this latter act the same sense in which the former had been received by judicial construction. In other words, the Legislature approved of the interpretation adopted by the Courts, and meant to incorporate it as a distinct and express enactment of the statute." *State v. Girkin,* 23 N.C. 121, 123 (1840).

The interpretations placed on the statute by *Chief Justice Ruffin*

have not been overruled. We are not disposed now to overrule them. The words "on purpose" have the same significance as the word "maliciously." The words "without malice aforethought" were included in the statute to differentiate it from G.S. 14-30 and made it clear and definite that allegation and proof of premeditation (prepense) are not a requirement in the prosecution of offenses under G.S. 14-29. At common law, and at the time of the decision in the *Wright* case, it was only in mayhem cases involving the cutting out of the tongue or putting out of the eyes that *malice aforethought* was an essential element of the offense. In all other cases malice without premeditation was sufficient. Defendant's assumption that malice aforethought was an element of all acts of mayhem at common law is a mistaken one. Insofar as the instant case is concerned, under our statute the elements of the offense of mayhem are the same as at common law when the *Wright* case was decided in 1603. Consent of the victim in the case at bar is no defense to the charge in the bill of indictment, and no defense to James Bryson and George Bryson should they be prosecuted for mayhem. It would be strange policy indeed if a man could hire or persuade another to kill him and the murderer, by reason of the consent, go free, or if one could persuade another to disable him and the other escape punishment by reason of the consent. Our government is deeply concerned, financially and otherwise, for the health of its citizens and that they not become a public charge. Likewise our commonwealth needs the services of its citizens quite as much as the kings of England needed the services of theirs. It is true that G.S. 14-29 provides that "if any person shall . . . disable . . . the member of any *other person*" he shall be guilty of the offense. But we are not here called upon to decide whether self-inflicted mayhem is a crime in North Carolina. Rogers' fingers were cut off by another or others.

(2) Defendant further contends that his acts, words and conduct were insufficient to make him answerable as an accessory before the fact to mayhem.

G.S. 14-5 provides: "If any person shall counsel, procure or command any other person to commit any felony . . . (he) shall be guilty of a felony, and may be indicted and convicted . . . whether the principal felon shall or shall not have been previously convicted . . . ."

The crime of accessory before the fact is a common law offense. ". . . As to . . . who may be an accessory *before* the fact; Sir Matthew Hale defines him to be one, who being absent at the time of the crime committed, doth yet procure, counsel, or command another to commit a crime . . . ." Chitty's Blackstone, Book IV, Ch. III, p. 36.

"Counsel," according to Black's Law Dictionary (2d Ed.), p. 280,

means: "Advice given by one person to another in regard to a proposed line of conduct, claim or ·contention . . . . The words 'counsel' and 'advise' may be, and frequently are, used in criminal law to describe the offense of a person who, not actually doing the felonious act, by his will contributed to it or procured it to be done."

In *State v. Williams*, 208 N.C. 707, 182 S.E. 131, defendant was charged with being an accessory both before and after the fact to murder. One Mozingo hired a man to kill deceased. Defendant carried kegs (all were in the illicit liquor business) to the scene of the killing and drove the killer to the scene in his automobile. He also furnished the killer a coat and a car for his escape. In a *per curiam* opinion the Court said: "The . . . facts . . . tend to show that defendant knew what was going on. Moreover, they tend to show that defendant was active in procuring a coat for the killer and in furnishing an automobile as a means of flight after the crime had been committed." No error was found in defendant's trial and conviction.

In the case at bar defendant said: "I knew what was going on." Defendant knew, at the time he injected Rogers' fingers, that Rogers intended to have his fingers cut off to collect insurance money and wanted his fingers deadened so he would not feel the pain. Defendant said that if Rogers didn't have any more sense than to cut his fingers off, he (defendant) didn't have any more sense than to give him the shots. Defendant was paid $29.00 for making the injection. Defendant gave Rogers a rubber tourniquet and showed him and George Bryson how· to use it when the fingers were cut off to prevent excessive bleeding. Thus, defendant, with full knowledge of Rogers' and Bryson's intentions, gave advice and treatment in regard to and in furtherance of the proposed line of conduct and thereby contributed to it. In our opinion, the evidence is sufficient to make out a *prima facie* case of counselling the commission of a felony.

"There are several elements that must concur in order to justify the conviction of one as an accessary before the fact: (1) That he advised and agreed, or urged the parties or in some way aided them to commit the offense. (2) That he was not present when the offense was committed. (3) That the principal committed the crime." 22 C.J.S., Criminal Law, § 90, p. 269.

"The concept of accessary before the fact has been held to presuppose some arrangement with respect to the commission of the crime in question." *Ibid*, § 92, p. 271.

"To render one guilty as an accessary before the fact to a felony he must counsel, incite, induce, procure or encourage the commission of the crime, so as to, in some way, participate therein by word or act. . . . It is not necessary that he shall be the originator of the de-

sign to commit the crime; it is sufficient if, with knowledge that another intends to commit a crime, he encourages and incites him to carry out his design. . . ." *ibid,* § 93(a), pp. 271, 272.

It is true that James Bryson was not present when defendant deadened Rogers' fingers and delivered and explained the use of the tourniquet. But we think the fact that James Bryson, the person who actually cut off Rogers' fingers, was not present and was not directly counselled makes no difference in this case.

"It is not essential that there be direct communication between the accessory before the fact and the principal, and any such communication between them may be through a third person. It has been further held not necessary, either that the accessory shall know by whom the crime is actually to be perpetrated, or that the identity of the accessory be known to the principal in the crime." 22 C.J.S., Criminal Law, § 93a, p. 272.

The conduct of defendant contributed to the act done by James Bryson and laid the ground work for it. Rogers consented to the act and the aid, assistance and counsel given him and George Bryson by defendant was in effect given to James Bryson through them. George Bryson by his own testimony was *particeps criminis.*

(3) Defendant's third and last contention is that Rogers changed his mind and did not want his fingers removed at the time they were cut off, and thereby "the chain was broken between Walter Rogers and the defendant."

It is true that Rogers testified that he changed his mind and didn't want his fingers cut off but that they were cut off notwithstanding. But James Bryson testified: "Walter Rogers asked me to cut his fingers off, and I cut them off at his request." If defendant's contention has merit, the matter cannot be considered on a motion to nonsuit. When the substantive evidence offered by the State is conflicting — some tending to inculpate and some tending to exculpate the defendant — it is sufficient to withstand a motion for nonsuit. *State v. Tolbert,* 240 N.C. 445, 82 S.E. 2d 201.

The court properly denied the motion for nonsuit.

The judgment below is

**Affirmed.**