STATE OF NORTH CAROLINA v. DONNA JONES ARNOLD

No. 245A90

(Filed 12 June 1991)

1. **Homicide § 30 (NCI3d) — first degree murder charged — submission of second degree murder — insufficiency of evidence — prejudicial error**

   The trial court erred in submitting murder in the second degree as a possible jury verdict where the evidence supported only a possible verdict of murder in the first degree, and such error was not harmless beyond a reasonable doubt, since

STATE v. ARNOLD

[329 N.C. 128 (1991)]

evidence that defendant procured, counseled, or commanded the principal to commit the crime was not overwhelming, nor was evidence as to causation overwhelming; and had not the inviting verdict of murder in the second degree been available to the jury, and its choice limited to guilty of murder in the first degree or not guilty, the verdict may well have been one of not guilty.

**Am Jur 2d, Homicide § 525.**

2. **Conspiracy § 31 (NCI4th)— conspiracy to commit murder— sufficiency of evidence**

The trial court did not err in failing to dismiss the charge of conspiracy to commit murder, since the conspiracy was complete upon the agreement between defendant and the principal, and it was not necessary for the jury to find that the object of the conspiracy was accomplished.

**Am Jur 2d, Conspiracy §§ 10, 15, 40; Homicide § 27.**

3. **Criminal Law § 45 (NCI3d)— experimental evidence—exclusion proper**

Even if the trial court erred by refusing to allow testimony concerning a witness's ability to produce photocopied letters like those introduced by the State, such error was not prejudicial to defendant, since there did not exist a reasonable possibility that a different outcome would have resulted absent the error in that defendant placed her theory before the jury during her own testimony, and the testimony prohibited by the court would merely have demonstrated that cutting, pasting, and photocopying letters is feasible, a proposition that would not be out of the ordinary juror's realm of experience.

**Am Jur 2d, Evidence § 825.**

4. **Criminal Law § 1177 (NCI4th)— aggravating factor—taking advantage of position of trust—husband and wife**

The trial court in a murder and conspiracy prosecution did not err in finding as an aggravating factor that defendant took advantage of a position of trust or confidence based on the fact that the victim and defendant were husband and wife. N.C.G.S. § 15A-1340.4(a)(1)(n).

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554.**

STATE v. ARNOLD

[329 N.C. 128 (1991)]

5. **Criminal Law § 1177 (NCI4th) — position of trust aggravating factor — extenuating relationship mitigating factor — no inconsistency**

The trial court's finding as an aggravating factor in sentencing defendant for conspiracy to murder her husband that defendant took advantage of a position of trust or confidence was not inconsistent with the court's finding as a mitigating factor that the relationship between defendant and the victim was an extenuating circumstance where the aggravating factor was based on the marital relationship and the mitigating factor was based on the victim's revelation that he had had a homosexual relationship with the principal murderer.

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide § 554.**

Justice MEYER dissenting.

APPEAL by the State pursuant to N.C.G.S. § 7A-30(2) from a decision of a divided panel of the Court of Appeals, 98 N.C. App. 518, 392 S.E.2d 140 (1990), reversing in part the judgment of imprisonment entered by *Stevens, J.,* on 15 February 1988 in Superior Court, SAMPSON County. Defendant petitioned for, and this Court allowed, discretionary review of additional issues. Heard in the Supreme Court on 14 March 1991.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten, Assistant Attorney General,* for the State.

*Bass and Bryant, by Gerald L. Bass and John Walter Bryant,* for the defendant-appellee/appellant.

MARTIN, Justice.

Defendant was indicted for murder in the first degree and conspiracy to commit murder in the first degree for the stabbing death of her husband, Robert Daniel Arnold, Jr. Trial was held at the 15 February 1988 Criminal Session of Sampson County Superior Court before the Honorable Henry L. Stevens, III. On 16 March 1988, the jury returned guilty verdicts of conspiracy and murder in the second degree. Judge Stevens imposed consecutive sentences of fifteen years imprisonment for murder and ten years for conspiracy.[1] Defendant appealed to the Court of Ap-

---

1. We note that defendant was paroled 30 April 1991 after serving approximately three years of her prison sentences.

peals, which held that the trial court erred by submitting as a possible verdict murder in the second degree. The court affirmed the conspiracy conviction. The State appealed with respect to the murder charge, and defendant cross-appealed with respect to the conspiracy conviction. We agree with the decision of the Court of Appeals and therefore affirm.

On Wednesday, 18 July 1984, the lifeless body of Dan Arnold, Minister of Music at Immanuel Baptist Church in Clinton, was discovered by his wife, their children, and friends in the church parking lot. He had been stabbed and beaten about the head, and his wife's purse was found near his body. We note that this case received much publicity through television, radio, and newspaper accounts. Suspicion immediately focused on Carl Stuffel, a twenty-two-year-old barber who had lived with the Arnolds during the spring of 1984. Stuffel had learned his trade while in prison for breaking and entering. Stuffel admitted that he had taken drugs since he was a young boy and had engaged in numerous criminal activities over the years. Dan Arnold, who was commuting from Clinton to Wake Forest, N.C. to attend classes at Southeastern Baptist Seminary, met Stuffel on Valentine's Day of 1984 at the Valley Style Shop in Crabtree Valley Mall in Raleigh. Dan entered the shop with the owner's nephew and Stuffel cut his hair. Dan suggested that they have dinner together, and later that night the pair engaged in a homosexual relationship in a Raleigh motel. Stuffel told Dan about his problems with drugs and that he was currently charged with larceny of a firearm. Believing that he could help Stuffel with his problems, Dan eventually invited him to come live with his family at their home in Clinton, apparently before consulting with defendant. Defendant opposed Dan's decision because of Stuffel's criminal record, his involvement with drugs, and the possible effect his presence would have on the Arnolds' two young daughters. However, Dan persisted and took his family to meet Stuffel and his parents. Sometime after Easter of 1984, Stuffel moved into the Arnold home.

Defendant testified that just before Stuffel moved into their home, Dan asked her to allow Stuffel to impregnate her. Dan had had a vasectomy and he wished for Stuffel to be a substitute father. He also told his wife that Stuffel needed an ego boost and this would solve both problems. Defendant's negative reaction upset Dan and she finally agreed in order to calm him. Later, Dan decided that this idea was inappropriate. Shortly after Stuffel moved to

STATE v. ARNOLD

[329 N.C. 128 (1991)]

Clinton, defendant found a canceled check to a Raleigh motel. When she confronted Dan about it, he made up an explanation. That evening, he gave her a long letter to read while he and Stuffel took the babysitter home. In the letter, Dan confessed that he had been a homosexual since childhood, had had male lovers in every place they had lived, and had had a one-night affair with Stuffel. Defendant became very upset and left the house, driving around for several hours. Although she considered leaving Dan, she decided that she still loved him and that their relationship and family were worth saving. The next day, however, she and Stuffel began a sexual relationship.

Versions of defendant's relationship with Stuffel vary. Several months after the murder, defendant admitted to police that she had been involved with Stuffel briefly. She told them that he had encouraged her by saying that she had an opportunity to get even with her husband. She gave in to Stuffel on three occasions. At trial, defendant testified that Stuffel had raped her and then coerced her by threatening to expose Dan's bisexuality to the community and to harm her children. She did not tell investigators that she had been raped because she continued to feel threatened by Stuffel. Stuffel testified that the relationship was voluntary and had lasted several weeks. He also testified that he loved defendant deeply at that time.

After Dan's revelation, Stuffel began to belittle Dan at every opportunity. He also began to declare openly his love for Donna. On 18 May 1984, Dan went to his doctor for help with his nerves. He was tearful, crying, and suffering from low self-esteem. He told the doctor that he had seen his wife and Stuffel on the bed together; he worried that Carl was younger and better looking. The doctor prescribed a mild tranquilizer.

On 22 May, Stuffel asked Daniel Staten, a friend of Dan's, where he could obtain marijuana. Staten reported the conversation to Dan, who decided to evict Stuffel from his home. The Arnolds packed Stuffel's belongings and found a knife among his things. After telling Stuffel never to return, Dan took his family, along with Staten and his wife, to the beach. At Dan's request, Staten confronted defendant about her affair with Stuffel. Staten testified that she never responded and started crying.

In early June 1984, Stuffel was sick from drug use and called the Arnolds begging for help. They allowed him to come back

to Clinton briefly and, at his request, committed him to Dorothea Dix Hospital. The sheriff's deputy who drove Stuffel and the Arnolds to Dix testified that only Donna Arnold could control Stuffel. The Arnolds left for a week in the mountains, but wrote and called Stuffel frequently.

When they returned, the Arnolds visited Stuffel at Dix several times a week and took him out of the hospital on several occasions. Bill Dubrick, Stuffel's therapist, testified that at first he thought the physical contact he observed between Stuffel and the Arnolds was religious, but later realized that it was "a sexual feeling type thing." The staff at Dix had to ask them to stop touching because it was disruptive to the other patients. When discussing options for the future, Stuffel suggested that he could kill Dan. Stuffel brought this up repeatedly and Dan was warned about it. Dan told Dubrick that he would lose his position with his church if he did not end his relationship with Stuffel, but Dan said that he would rather move. Defendant found a resume dated 8 June 1984 in Dan's papers after his death.

On 5 July 1984, Stuffel asked permission to leave Dix on a weekend pass. Dan initially agreed that Stuffel could visit them in Clinton for the weekend, but he later called back to revoke his permission. Dan was hysterical because, he said, defendant had told him about her affair with Stuffel. The next day, Dan called again to give his permission for Stuffel to come for the weekend. However, the Dix staff decided not to allow the visit. That weekend, the Arnolds brought Stuffel's car and belongings to Raleigh and told him never to return to their home. Dubrick testified that Stuffel was depressed after their visit and was sure that defendant still loved him and wanted to be with him.

Jerald Tart testified under a limited grant of immunity. He had known Stuffel since high school, when the pair would burglarize homes and rob businesses together. Both eventually served prison terms for their crimes. Tart testified that while Stuffel was at Dix, he visited him there, but he had to use a false name because the staff feared that Tart might bring Stuffel drugs. On one of the visits, Stuffel asked Tart to kill Dan. Stuffel gave Tart a map and a key to the church, which Stuffel said that Donna had given him. Defendant was to send her husband back to the church to get her purse after choir practice on Wednesday night, 4 July 1984. Tart testified that he decided not to commit the murder

and he later returned the key to Stuffel. Tart met Stuffel and the Arnold family on Saturday, 7 July 1984, at the Hayes-Barton swimming pool in Raleigh. Tart testified that defendant asked him if he could help them with their problem. At that time, Dan was playing with the children out of earshot of Tart, Stuffel and defendant. When Tart responded that he did not think he could help them, Stuffel commented that he would like to drown Dan. Dix records indicate that the trip to the swimming pool actually occurred on 30 June 1984.

Stuffel testified that defendant initially approached him about killing Dan when they first took him out of Dix on a pass. He asked her to think about getting a divorce, but she responded that a divorce would be too difficult on the children. Her first suggestion was to have someone attack Dan at night while he was walking the dog. On her next visit, she brought a key to the church. Stuffel testified that Tart actually went to Clinton on 4 July but was unable to carry out the plan because there were police officers in the area. Defendant sent Dan back to the church as planned and later wanted to know what went wrong. A police officer testified that he saw Dan walking to the church on 4 July and that Dan told him that he was going to the church to take care of some business.

When Stuffel was discharged from Dix on 12 July 1984, he went to live with Jerald Tart and his family. He and Tart got jobs with Kip-Dell Homes, Inc. doing repair work on apartment complexes. Telephone records indicate that numerous phone calls were made between the Tart home and the Arnold home between 12 July and the murder on 18 July. Defendant initially told police that her husband had made and received the calls, but later admitted that she had talked with Stuffel during that period.

On 17 July 1984, Dan wrote a letter to a friend, Bill Poole, whose brother was an S.B.I. agent. In the letter, he asked Bill to deliver an enclosed letter to his brother; the letter contained a list of drug dealers, compiled by Stuffel. He asked Bill to forward the enclosed letter to his brother "to insure that Carl pays 'until it hurts' for what he has done to Donna and me." Dan wrote that Stuffel pressured defendant into a relationship after Dan told her about his past and she gave in to Stuffel three times, but had come to her senses. Dan said that he had once found them lying across the bed together. Dan said that he wished Stuffel were

STATE v. ARNOLD

[329 N.C. 128 (1991)]

dead and would kill him if he could get away with it. He asked Bill to contact a "special friend" to inform the drug dealers that Stuffel had become an informant. Stuffel had once told Dan that if these drug dealers ever found out he had revealed their identities, they would kill him. Dan closed by saying, "I want him dead and will not rest until he is."

On the day of Dan's death, 18 July, Staten went to Dan's office and told him he thought that he had seen Stuffel's car in Clinton. Dan was angry and frightened by the news. Dan told Staten that he wanted Stuffel out of the picture and he asked Staten to kill Stuffel. Staten turned him down, and Dan brought up the idea of contacting the list of drug dealers. Staten advised against it because he believed that Dan would be the one killed.

On the evening of 18 July 1984, the Arnolds attended the weekly service at their church and afterwards held choir practice. Along with Michelle Honeycutt, they sorted music and finally headed home around 9:30 p.m. Honeycutt and her daughter accompanied them so that Mrs. Honeycutt and defendant could practice the piano. During this session, defendant began to have trouble with her contact lenses. When she looked for her contact lens case, she discovered that she had left her purse at the church. She told her husband that she would go and get it, but he told her to continue practicing and he would retrieve it for her. According to Honeycutt, defendant told Dan that she did not really need her purse because she had what she needed at home. Nevertheless, Dan left the house about 10:15 p.m. and drove to the church, which was nearby. Thirty minutes later, defendant began to worry and called his office at the church, but received no response. Mrs. Honeycutt drove defendant and their children to the church in search of Dan. When they observed his body in the parking lot, defendant became upset, and Honeycutt drove to get help. When they returned to the scene, Honeycutt prevented defendant, who was hysterical, from going to Dan's body. According to Honeycutt, defendant later became calm as if in a state of shock.

Tart testified that he drove Stuffel to Clinton on the evening of 18 July. He parked his car in a shopping center parking lot; the Arnold residence was visible from this vantage point and the church was nearby. Stuffel got out of the car and left the area, while Tart went to McDonald's for something to eat. Tart returned to his car and watched high school girls until Stuffel returned

about an hour later. When Stuffel got in the car he had his shirt in his hands and had blood on his forearms and hands. A scuba diving knife was rolled up in the shirt. Stuffel told him that he and Dan had gotten into a fight and he wished it had not happened. They returned to Raleigh, stopping along the way to drop the clothes and the knife in a creek. Although Stuffel never confessed to Tart that he had killed Dan Arnold, he threatened that he would take Tart down with him if he told anyone about their activities. Tart told the police different stories about where they had been that night. One week after the murder, Tart's mother asked Stuffel to leave her home. It was not until 1987 that he related his version of the events in Clinton.

Carl Stuffel testified that Jerald Tart participated in the stabbing of Dan Arnold. He alleged that he talked with defendant on the day before the murder and she confirmed that she still wanted her husband dead. She also told him she would leave her purse at the church again. Defendant admitted that she talked with Stuffel that day and Stuffel wanted to come to Clinton on her birthday, 19 July. She refused because she did not want any controversy on her birthday. She told police in her written statement that she agreed for Stuffel to come to Clinton on Wednesday night, but testified at trial that Stuffel never said that he was definitely coming that evening.

Stuffel testified that he and Tart planned the crime together. Each had a scuba knife and Tart had a slap stick, a ten-inch long metal shank covered by leather. They waited in the bushes until Dan came back to the church. While he was inside retrieving the purse, they repositioned themselves closer to the building. Stuffel testified that when he first saw Dan, Tart was hitting him with the slap stick; Stuffel told Tart to hold Dan's head away from him because he could not bear to look at him. Stuffel drew his knife and looked away from Dan and Tart. When he looked back, the knife was in Dan's chest. After Dan fell to the ground, Tart cut Dan's neck on both sides to make sure that he was dead. The pair returned to Raleigh after disposing of their clothes and weapons. Blood was found on the floor of Tart's car on both the passenger's and driver's sides.

The medical examiner testified that Dan Arnold died as a result of multiple stab wounds. His throat had been slit on both sides and he had numerous superficial wounds in his back. There

was one deep stab wound to the chest. There were wounds to the head caused by a blunt instrument, which could have been caused by a slap stick similar to the one owned by Tart. The cause of death was the wounds on the neck and to the chest. At least one of the wounds to the neck was made while the victim was standing, as revealed by the large amount of blood on his pants.

On the morning of 19 July 1984, Stuffel called defendant to wish her a happy birthday. Mrs. Honeycutt listened in on the conversation. Defendant informed Stuffel that Dan had been murdered and Stuffel feigned surprise, but, according to Honeycutt, was not very convincing. Both defendant and Stuffel were questioned several times in the week following the murder. On 3 August 1984, defendant brought to police a handwritten statement of the events leading to her husband's death. She admitted a brief involvement with Stuffel, but did not mention rape. She wrote that she had lied about her husband's homosexuality in order to protect his reputation in the community. The police made no arrests and defendant moved with her daughters to Virginia.

In January 1987, Jerald Tart was charged with larceny of a safe. His mother, who in the past had participated in the criminal activities of Stuffel and her son, came forward with photocopies of letters and envelopes allegedly written by defendant to Stuffel. Mrs. Tart claimed to have found them among Stuffel's things while he was living at her home in 1984. On the advice of Joseph Dean, her lawyer, she returned them to Stuffel, who burned them. Jerald Tart testified that he did not know until 1987 that his mother copied the letters before returning them to Stuffel. Jerald was granted immunity for having driven Stuffel to Clinton and probation for the larceny charge in return for this information and his testimony at defendant's trial.

The letters expressed defendant's love for Stuffel and her hopes for the future. The most incriminating statement contained in the letters was as follows: "Words cannot fully express to you how anxious I am for Wed. to be here. I have real fears for your safety though. Our someday is so close." Defendant admitted that the handwriting appeared to be hers, but denied having written those letters. Her theory was that the letters were pieced together from legitimate letters she wrote to Stuffel and were copied to disguise the ruse.

STATE v. ARNOLD

[329 N.C. 128 (1991)]

After receiving these letters, police believed that they had sufficient evidence to proceed against defendant and Stuffel. They were both arrested in February 1987, nearly two and one-half years after the murder. Stuffel did not implicate defendant in the murder until the day his plea to murder in the second degree was entered; his sentencing was scheduled for after defendant's trial. He testified that while he was in prison he concluded that defendant had only used him to get rid of her husband and was having an affair with someone else at the time of their involvement.

Judge Stevens announced his intention to submit murder in the second degree as a possible verdict and explained that he did so out of fairness to defendant because Stuffel had negotiated a plea of guilty to murder in the second degree. Defendant's attorneys objected.

Defendant was prosecuted on the accessory before the fact theory[2] and therefore the State must prove, *inter alia*, that the principal, Carl Stuffel, committed murder in the second degree in order for defendant's conviction to stand. *See State v. Benton I*, 275 N.C. 378, 167 S.E.2d 775 (1969) (In the accessory's trial, guilt of the principal must be alleged and proved to the same degree of certainty as if he himself were on trial, that is, beyond a reasonable doubt.).

[1] Defendant contends that the trial court erred by submitting murder in the second degree as a possible jury verdict in violation of the rule in *State v. Strickland*, 307 N.C. 274, 298 S.E.2d 645 (1983), because there was no evidence which negated premeditation and deliberation. In *Strickland*, this Court held that a trial court is not required to submit lesser included offenses as possible jury verdicts where there is no evidence to support such lesser included offense. *Id.* at 291, 298 S.E.2d at 656. Favoring the evidentiary approach, the Court overruled *State v. Harris*, 290 N.C. 718, 228 S.E.2d 424 (1976), which required a trial judge to submit murder in the second degree whenever the State relied upon premeditation and deliberation in a murder charge. The Court noted that while guilt of murder in the first degree encompasses guilt of murder in the second degree, the trial judge was only required to sub-

2. This Court rejected the argument that there can be no accessory before the fact to murder in the second degree as a matter of law, because malice, which imports a specific intent, is an element of murder in any degree. *State v. Benton II*, 276 N.C. 641, 656, 174 S.E.2d 793, 803 (1970).

STATE v. ARNOLD

[329 N.C. 128 (1991)]

mit the lesser offense where "the evidence raises a question with respect to premeditation and deliberation or malice, either under the facts or as raised by defendant's defenses." *Strickland*, 307 N.C. at 283 n. 1, 298 S.E.2d at 652.

The *Strickland* Court noted the possible constitutional implications of the *Harris* rule, as set forward by the United States Supreme Court in *Hopper v. Evans*, 456 U.S. 605, 72 L. Ed. 2d 367 (1982). The defendant in *Hopper* was tried under an Alabama statute which was later declared unconstitutional because it precluded the submission of a lesser included offense in a capital case. *See Beck v. Alabama*, 447 U.S. 625, 65 L. Ed. 2d 392 (1980). In *Hopper*, the Court held that the defendant was not prejudiced by the failure to submit lesser offenses because all the evidence, including his own confessions and testimony, supported a theory of premeditation and deliberation, and there was no evidence to negate any element of murder in the first degree. Analyzing *Beck*, the Court stated:

> [D]ue process requires that a lesser included offense instruction be given when the evidence warrants such an instruction. But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction. The jury's discretion is thus channelled so that it may convict a defendant of any crime fairly supported by the evidence.

*Evans*, 456 U.S. at 611, 72 L. Ed. 2d at 373.

The State concedes that the trial court did not follow the *Strickland* rule, but argues that the error was favorable to the defendant. The State further contends that the judgment is supported by the evidence. We disagree. The evidence presented in this case clearly shows a premeditated and deliberated killing. Stuffel admitted that he waited for Dan Arnold at the church in order to mount a surprise attack. He used a scuba knife obtained specifically for this crime and stabbed the victim repeatedly. Moreover, there is no evidence to suggest that this murder occurred during a fight, other than Stuffel's purported statement to Jerald Tart, himself a likely participant. The record illustrates the previous difficulties between Stuffel and the victim, regarding not only Stuffel's relationship with defendant, but also his relationship with Dan and Stuffel's drug use. Finally, Stuffel disposed of the weapon, which indicates an intent to conceal the crime. *E.g., State v. Barts*, 316 N.C. 666, 687-88, 343 S.E.2d 828, 842 (1986) (circumstances from

which premeditation and deliberation can be inferred). We hold, therefore, that the trial court erred in submitting the possible verdict of murder in the second degree because the evidence supports only a possible verdict of murder in the first degree.

Our inquiry does not end with the determination that the court erred in this case. This Court has held that some errors of this type are not prejudicial to the defendant because had the jury not had the option of convicting on the lesser offense, it would likely have convicted on the greater offense, subjecting the defendant to harsher penalties. *See, e.g., State v. Vestal*, 283 N.C. 249, 195 S.E.2d 297, *cert. denied*, 414 U.S. 874, 38 L. Ed. 2d 114 (1973).

The Court of Appeals held, and we agree, that the appropriate standard for review in the case at bar is found in N.C.G.S. § 15A-1443(b), which provides that

[a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

N.C.G.S. § 15A-1443(b) (1988). Where defendant is convicted upon a charge for which there is insufficient evidence, defendant's federal due process rights have been violated. *Thompson v. Louisville*, 362 U.S. 199, 4 L. Ed. 2d 654 (1960); *see also Hopper v. Evans*, 456 U.S. 605, 72 L. Ed. 2d 367; *Beck v. Alabama*, 447 U.S. 625, 65 L. Ed. 2d 392 (due process requires submission as possible verdicts *only* those lesser included offenses for which there is sufficient evidence). The State must therefore prove that the error was harmless beyond a reasonable doubt. Overwhelming evidence of defendant's guilt may render constitutional error harmless beyond a reasonable doubt. *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569, *cert. denied*, 459 U.S. 1080, 74 L. Ed. 2d 642 (1982).

We do not find the evidence to be overwhelming. In order to convict defendant for murder in the first degree as an accessory before the fact, the State must prove beyond a reasonable doubt that (1) the principal (Stuffel) committed murder in the first degree; (2) defendant was not present when the murder occurred; and (3) defendant procured, counseled or commanded Stuffel to commit the crime. *State v. Woods*, 307 N.C. 213, 297 S.E.2d 574 (1982). In addition, it is necessary the defendant's act "caused or directly

STATE v. ARNOLD

[329 N.C. 128 (1991)]

contributed to the death of the victim." *State v. Brock*, 305 N.C. 532, 539, 290 S.E.2d 566, 571 (1982). There is little question that the first two elements have been satisfied. Evidence that defendant "counseled, procured or commanded" Stuffel was simply not overwhelming. *Id.* at 218, 297 S.E.2d at 577. The State's main witnesses were convicted felons who stood to benefit from their testimony against defendant. The letters which prompted the arrest of defendant were photocopies that did not surface until one of the participants in the crime was in further trouble with the law. Furthermore, defendant presented evidence that she did not insist that her husband return to the church to get her purse. Tart admitted that he saw television news accounts reporting that defendant sent the victim back to the church to retrieve her purse. We hold that the evidence as to this element of murder in the first degree as an accessory before the fact is less than overwhelming.

Moreover, evidence as to causation is not overwhelming. "Causation of a crime by an alleged accessory is not 'inherent' in the accessory's counsel, procurement, command or aid of the principal perpetrator." *State v. Davis*, 319 N.C. 620, 626, 356 S.E.2d 340, 344 (1987). Therefore, even if the evidence was overwhelming that defendant procured or counseled Stuffel to commit the crime, it is not readily apparent that said counsel caused Stuffel to commit the murder. Stuffel had a myriad of reasons for killing Dan Arnold. For example, Dan was plotting against Stuffel by revealing that Stuffel had become an informant against certain drug dealers, whom Dan hoped would kill Stuffel in retaliation. Stuffel's therapist indicated that during therapy sessions Stuffel came up with the idea to kill Dan as a solution to his problems and returned to this theme repeatedly. This occurred while Stuffel was at Dix, before the telephone conversations between defendant and Stuffel and before the letters were allegedly written by defendant to Stuffel. We conclude, therefore, that the evidence was not overwhelming because it could raise doubts in the minds of reasonable jurors.

Our conclusion is further demonstrated by the fact that the jury found defendant guilty of murder in the second degree, a charge which was not supported by the evidence. This verdict was also tantamount to a verdict of not guilty as to the capital charge. Had not the inviting verdict of murder in the second degree been available to the jury, and its choice limited to guilty of murder in the first degree or not guilty, the verdict may well have been one of not guilty. The State having failed to prove that the error

was harmless beyond a reasonable doubt, we hold that defendant was prejudiced by the trial court's error and her conviction for murder in the second degree was properly reversed.

[2] Defendant contends that the trial court erred in failing to grant her motion to dismiss the charge of conspiracy to commit murder, because there can be no conspiracy, as a matter of law, to commit murder in the second degree. She further alleges that the court committed plain error by failing to charge the jury that it could not find defendant guilty of both conspiracy and murder in the second degree.

Conspiracy, a common law offense, is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means. *E.g., State v. Littlejohn,* 264 N.C. 571, 142 S.E.2d 132 (1965). A conspiracy may be an implied understanding, rather than an express agreement. *State v. Smith,* 237 N.C. 1, 74 S.E.2d 291 (1953). Because the conspiracy is complete once the agreement is made, *e.g., State v. Bindyke,* 288 N.C. 608, 220 S.E.2d 521 (1975), subsequent commission and conviction of the substantive crime do not affect the conspiracy conviction. *Cf. State v. Guthrie,* 265 N.C. 659, 144 S.E.2d 891 (1965) (acquittal of conspiracy not inconsistent with conviction for substantive offense).

Defendant was indicted for conspiracy to commit murder in the first degree and convicted of conspiracy to commit murder. As conspiracy encompasses any unlawful act, the nature of the felony involved relates only to the severity of punishment which is the same for conspiracy to commit any murder. *See* N.C.G.S. § 14-2.4 (1988). The conspiracy was complete upon the agreement between defendant and Stuffel. It was not necessary for the jury to find that the object of the conspiracy was accomplished. *State v. Guthrie,* 265 N.C. 569, 144 S.E.2d 891. Therefore, we hold that there was no error in the failure of the trial court to dismiss the conspiracy charge. Likewise, defendant has failed to demonstrate plain error with regard to the jury instruction. In fact, she has made no argument at all in support of this issue. Accordingly, we overrule this assignment of error.

[3] We next examine defendant's argument that the trial court erred by refusing to allow testimony concerning an experiment or demonstration. Defendant attempted to offer the testimony of Osborne Wade, who had testified on defendant's behalf earlier in the trial. After listening to witnesses concerning the photocopied

letters, Wade went home and experimented with letters written by his wife, to determine if the letters offered by the State could have been manufactured by Jerald Tart or his mother. Wade would have testified that he could produce similar letters by using a copy machine. The court ruled that this demonstration would be too confusing and refused to permit Wade's testimony. The Court of Appeals held that the court committed error, but it was harmless because defendant was able to acquaint the jury with her theory that the letters had been manufactured through her own testimony. Defendant argues that the error could not be considered harmless because the State placed great emphasis on the letters. In fact, the discovery of the letters led to defendant's arrest in 1987.

Assuming, *arguendo*, that the trial court erred, we hold that the defendant was not prejudiced because there does not exist a reasonable possibility that a different outcome would have resulted absent the error. N.C.G.S. § 15A-1443(a) (1988); *e.g., State v. Price*, 326 N.C. 56, 388 S.E.2d 84, *death sentence vacated*, --- U.S. ---, 112 L. Ed. 2d 7 (1990). Defendant placed her theory before the jury during her own testimony. The testimony prohibited by the court would merely have demonstrated that cutting, pasting, and photocopying letters is feasible, a proposition that would not be out of the ordinary juror's realm of experience. Accordingly, we overrule this assignment of error.

[4] Finally, we turn to defendant's contention that the trial court erred by finding that defendant took advantage of a position of trust or confidence as an aggravating factor. N.C.G.S. § 15A-1340.4(a)(1)(n) (1988). The court sentenced defendant to the maximum term of ten years on the conspiracy conviction, but did not aggravate the murder conviction. The presumptive term for conspiracy is three years. N.C.G.S. §§ 14-2.4(2); 15A-1340.4(f)(6) (1988). Defendant argues that the evidence does not support this aggravating factor, which is usually applied in cases where the victim is very young or mentally impaired. *See, e.g., State v. Midyette*, 87 N.C. App. 199, 360 S.E.2d 507 (1987), *aff'd per curiam*, 322 N.C. 108, 366 S.E.2d 440 (1988).

In *State v. Daniel*, 319 N.C. 308, 354 S.E.2d 216 (1987), this Court addressed the issue of whether finding as aggravating factors that the victim was very young and that defendant took advantage of a position of trust or confidence was erroneous because based

on the same evidence. The Court held that there was no error, concluding that:

> [t]he aggravating factor that the defendant took advantage of a position of trust or confidence was grounded not in the youth of her child but more fundamentally in the child's dependence upon her. A finding of this aggravating factor depends no more on the youth of the victim than it does on the notion that confidence or trust in the defendant must repose consciously in the victim. Such a finding depends instead upon the existence of a relationship between the defendant and victim *generally conducive to reliance of one upon the other.*

*Id.* at 311, 354 S.E.2d at 218 (emphasis added). The Court of Appeals has upheld this factor where the murder victim was the defendant's best friend, *State v. Potts*, 65 N.C. App. 101, 308 S.E.2d 754 (1983), *disc. rev. denied*, 311 N.C. 406, 319 S.E.2d 278 (1984), and therefore we conclude that the husband-wife relationship permits the finding of this factor. In some marriage-related situations, finding this aggravating factor may be inappropriate. The evidence here suggests that Dan Arnold did not distrust his wife, but rather believed that she had "come to her senses" and ended her relationship with Stuffel. Therefore, we hold that the evidence supports the trial court's decision.

[5] In addition to the one aggravating factor, the court found five mitigating factors as follows:

1. The defendant has no record of criminal convictions.

2. The defendant was a passive participant in the commission of the offense.

3. The defendant acted under strong provocation.

4. The relationship between the defendant and the victim was an extenuating circumstance.

5. The defendant has been a person of good character and has had a good reputation in the community in which she lives.

Defendant argues that the finding that the relationship between the defendant and the victim was an extenuating circumstance was inconsistent with the aggravating factor found. The State argues, and we agree, that the evidence on which the mitigating factor is based was the victim's revelation that he was a homosexual

STATE v. ARNOLD

[329 N.C. 128 (1991)]

and had had an affair with Carl Stuffel. This evidence is separate from, and not in conflict with, the trust that the victim had for defendant. Therefore, the trial court did not err in finding the aggravating and mitigating factors.

Finally, we find no abuse of discretion in the balancing process between the one aggravating factor and the five mitigating factors. *See State v. Penley,* 318 N.C. 30, 347 S.E.2d 783 (1986). The only aggravating factor found was that the defendant violated a position of trust or confidence. Defendant concedes that it is not the number of factors found, but the nature of the factors that weigh in the balancing process. We agree with the State that the aggravating factor here, based on defendant's betrayal of the marital relationship, could weigh more heavily in the balance. *See State v. Ahearn,* 307 N.C. 584, 300 S.E.2d 689 (1983). Finding no abuse of discretion, we overrule defendant's assignment of error. Accordingly, the decision of the Court of Appeals is

Affirmed.

Justice MEYER dissenting.

I dissent from that portion of the majority's opinion which finds error in the guilt phase of defendant's trial on the basis that the evidence was not overwhelming as to whether defendant counseled, procured, or commanded Stuffel to murder her husband. I also disagree with the majority's holding that, even assuming that defendant did procure or counsel Stuffel, it is "not readily apparent that said counsel caused Stuffel to commit the murder."

The facts as outlined in the majority's opinion and in the record would support defendant's conviction for murder in the first degree as an accessory before the fact. Jerald Tart testified that while visiting Stuffel at Dix, Stuffel gave him a map and a key to the church, which Stuffel said defendant had given to him. Defendant was to send her husband, Dan, back to the church to get her purse after choir practice on Wednesday night, 4 July 1984. Tart testified that he decided not to commit the murder and later returned the key to Stuffel. Tart further testified that, on 7 July 1984, defendant asked him if he could help them with their problem.

Stuffel testified that defendant initially approached him about killing Dan. He asked her to consider a divorce, but she responded that a divorce would be too hard on the children. Her first sugges-

tion was to have someone attack Dan at night while he was walking the dog. On her next visit to Stuffel, she brought a key to the church. Stuffel testified that Tart actually went to Clinton on 4 July but was unable to carry out the plan because there were police officers in the area. Stuffel testified that he talked with defendant on the day before the murder, and she confirmed that she still wanted her husband dead. She also told him again that she would leave her purse at the church. Defendant told police in her written statement that she agreed for Stuffel to come to Clinton on Wednesday night, but testified at trial that Stuffel never said that he was definitely coming that evening.

Telephone records indicate that numerous phone calls were made between the Tart home, where Stuffel lived, and the Arnold home between 12 July and the murder on 18 July. Defendant eventually admitted that she had talked with Stuffel during that period.

On the evening of 18 July, the Arnolds attended the weekly service at their church and afterwards held choir practice. Michelle Honeycutt left the church with the Arnolds around 9:30 p.m. Mrs. Honeycutt and her daughter accompanied them so that Mrs. Honeycutt and defendant could practice the piano. Mrs. Honeycutt testified that during the session, defendant began to have trouble with her contact lenses. She discovered that she had left her purse at the church. Defendant went into the bedroom, got Dan up, and told him she had forgotten her purse. Defendant told her husband that she would go and get it, but he told her to continue practicing and he would retrieve it. Mrs. Honeycutt further testified that defendant told Dan that she did not really need her purse because she had "stuff" at home. Thirty minutes later, defendant, who seemed worried, called Dan's office at the church but did not get an answer. Defendant told Mrs. Honeycutt that she was going to the church to check on Dan. Mrs. Honeycutt replied that she would ride by, but defendant said, "No, you're not going over there by yourself either." Defendant suggested that they take a neighbor with them, but Mrs. Honeycutt dismissed the suggestion. Mrs. Honeycutt drove defendant and their children to the church, where they found Dan's body in the parking lot. Defendant's pocketbook was lying at Dan's feet.

The State introduced three copies of letters Stuffel received from defendant after he was released from Dix. Defendant admitted that the handwriting appeared to be hers, but denied having writ-

ten those letters. An SBI handwriting analysis revealed that there was a "high degree of belief" that the letters could have been written by defendant. Jerald Tart's mother had found the original letters among Stuffel's belongings while he was living at the Tart residence. She had taken them to Jerald's lawyer, who told her to return them to Stuffel. She made photocopies and returned the originals to Stuffel, who burned them. The first letter submitted reads:

> "Wed. Dearest Carl, on my way downtown, so thought I'd scribble a quick hello before I go. Please excuse fancy writing paper. I love you and hope your day is going well. Am so proud of you for going through the detox program and I pray that you will never again be troubled by drugs or alcohol again. Your body is too precious to ever be messed up again. I know you are happy to be breathing some good fresh air and I am really happy for you. Hope your job hunting will be successful. How I long to be near you Carl. Love always, Donna."

A second letter, in an envelope addressed to Carl E. Stuffel and dated 11 July 1984, reads:

> "Friday. Dear Carl: Hellow [sic]. Hope you are having a good day today. Have been thinking of you constantly. How is your new job? Do you have to travel far from Jerald's to go to work? *Words cannot fully express to you how anxious I am for Wed. to be here. I have real fears for your safety though." "Our some day is so close.* Please know that I love you with all my heart and want so very much for you to be happy. We will make a good team. Hope you are smiling. The girls and I miss you so much. All my love, Donna."

(Emphasis added.) The third exhibit submitted was a card in an envelope addressed to Carl E. Stuffel and dated 10 July 1984. A note at the top of the card is printed and reads:

> "They are telling you you are thought about just happens now and then [sic]. You come to mind in special ways time and time again."

The words, "time and time again," are underlined. The card continues, in handwriting:

"Carl, have a really great day and know that I am thinking of you and loving you in every way. Keep focusing on our some day. Love always, Donna."

As the majority noted, to support the third element of murder in the first degree as an accessory before the fact, the State must prove beyond a reasonable doubt that defendant procured, counseled, or commanded Stuffel to commit the murder. *State v. Woods*, 307 N.C. 213, 297 S.E.2d 574 (1982). However, it is sufficient to prove the element if defendant advised and agreed or urged Stuffel or in some way aided Stuffel to commit the offense. *State v. Bass*, 255 N.C. 42, 120 S.E.2d 580 (1961); *see State v. Branch*, 288 N.C. 514, 220 S.E.2d 495 (1975), *cert. denied*, 433 U.S. 907, 53 L. Ed. 2d 1091 (1977); *State v. Benton*, 275 N.C. 378, 167 S.E.2d 775 (1969); *see also State v. Hewitt*, 33 N.C. App. 168, 234 S.E.2d 468 (1977) ("counsel" describes the offense of a person who, although not actually having committed the felonious act, by her will contributed to it); *State v. Sauls*, 29 N.C. App. 457, 224 S.E.2d 702, *rev'd on other grounds*, 291 N.C. 253, 230 S.E.2d 390 (1976) (an accessory before the fact is one who furnishes the means to carry out the crime, whose acts bring about the crime in connection with the perpetrator, or one who instigates it), *cert. denied*, 431 U.S. 916, 53 L. Ed. 2d 226 (1977).

There is plenary evidence in the record to support a finding that defendant advised, contributed, instigated, or, at a minimum, in some way aided Stuffel to commit the murder. Defendant first suggested that Dan be attacked while he was walking the dog at night. Later, she procured a key to the church where Dan was to be killed. Defendant and Stuffel agreed that she would leave her purse at the church after evening choir practice and use this as a ruse to get Dan to return to the church.

Furthermore, the majority concludes that even assuming the third element is satisfied, because a "myriad of reasons" existed for Stuffel to kill Dan Arnold, it is not "readily apparent" that defendant's "counsel" caused Stuffel to commit the killing. Possible multiple reasons for committing a murder do not preclude the finding that defendant did cause Stuffel to kill her husband. There is overwhelming evidence that defendant caused the chain of events that ultimately ended in Stuffel murdering her husband.

Having concluded that there was overwhelming evidence that defendant counseled or procured Stuffel to murder her husband

and that her acts caused Stuffel to commit the murder, I vote to find harmless error beyond a reasonable doubt in the guilt phase. This error was not prejudicial to the defendant because, had the jury not had the option of convicting on the lesser offense, it would have convicted on the greater offense, subjecting defendant to harsher penalties.